FILED
03 JUN 18 PM 2: 52
SOUTHERN DISTRICT COURT
EASTERN ST LOUIS OFFICE ILLINOIS

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

**FILED**

JUN 18 2003

CLERK OF CIRCUIT COURT #10
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

|  |  |  |
|---|---|---|
| ILLINOIS MUNICIPAL RETIREMENT FUND, | ) | |
| Plaintiff, | ) | |
| | ) | Cause No. 03-L-772 |
| vs. | ) | |
| | ) | 03-465-WDS |
| CITIGROUP, INC., SALOMON SMITH BARNEY INC., J.P. MORGAN SECURITIES INC., J.P. MORGAN CHASE & CO., BANK OF AMERICA CORP., BANC OF AMERICA SECURITIES LLC, ABN AMRO INCORPORATED, DEUTSCHE BANK AG, DEUTSCHE BANC ALEX. BROWN INC., LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS INC., CREDIT SUISSE GROUP, CREDIT SUISSE FIRST BOSTON CORP., GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO., UBS WARBURG LLC, NATIONSBANC MONTGOMERY SECURITIES LLC and ARTHUR ANDERSEN LLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

## COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933

Comes now plaintiff, ILLINOIS MUNICIPAL RETIREMENT FUND, by and through its undersigned counsel and for its Complaint states as follows:



## SUMMARY OF ACTION

1.      This is a securities suit involving WorldCom, Inc. ("WorldCom" or the "Company"),[1] naming as defendants WorldCom's commercial/investment bankers and its accountants (collectively, "defendants") for violations of the Securities Act of 1933 ("1933 Act"), arising out of plaintiff's purchases of WorldCom debt securities (the "WorldCom Bonds") first sold to public investors in WorldCom's 8/98, 5/00, 12/00 and 5/01 bond offerings (the "Offerings"). This action involves solely strict liability and *negligence* claims.

2.      WorldCom and its bankers raised billions of dollars in several offerings of investment-grade rated bonds in 98, 00 and 01 by means of Prospectuses and Registration Statements filed with the U.S. Securities and Exchange Commission ("SEC") which contained false statements:

| Effective Date of Registration Statement/Offering Circular | Face Amount of Notes Offered[2] |
|---|---|
| 8/7/98 | $ 6.1 billion |
| 5/12/00 | $ 5.0 billion |
| 12/14/00* | $ 2.0 billion* |
| 5/9/01 | $11.8 billion |

* Exempt from registered offering.

3.      Plaintiff Illinois Municipal Retirement Fund ("IMRF") is an instrumentality of local government in the State of Illinois and was created in 1939 by the Illinois General Assembly to provide employees of local governments and school districts in Illinois (with the exception of the City of Chicago and Cook County) with a sound and efficient system for the payment of retirement, disability, and death benefits. IMRF serves 2,800 employers and has more than $14 billion in assets. As of December 2002, IMRF counted 167,776 active members, 73,360 retired members, and 2,853 local units of government in Illinois. IMRF made purchases of WorldCom Bonds as described in Exhibit A without knowledge of the falsity of Registration Statements and Prospectuses by which the Bonds were issued and has been damaged thereby.

---

[1]      WorldCom is in bankruptcy and cannot, absent permission of the bankruptcy court, be sued.

[2]      The 8/98 and 5/00 offerings each included $1.5 billion in notes that matured in 01, prior to WorldCom's admissions of false financial statements, and are not part of this action.

4.      WorldCom is now bankrupt and the bonds are in default. WorldCom subsequently admitted, in 6/02, that its financial results contained in the 5/01 Registration Statement and Prospectus were overstated by $3.85 billion. Then, in 7/02, WorldCom admitted that its financial results included in the 5/00, 12/00 and 5/01 Registration Statements were overstated by an additional $3.83 billion. Then, in 9/02, WorldCom revealed an additional $2 billion in earnings misstatements due to accounting entries going back to 98, impacting the statements made in the Registration Statement related to the 8/98 offering.  On 9/26/02, David Myers ("Myers"), the former controller of WorldCom, pleaded guilty to securities fraud charges, admitting he was instructed to falsify records in what became the largest corporate accounting scandal in U.S. history. "I was instructed on a quarterly basis by senior management to ensure that entries were made to falsify WorldCom's books to reduce WorldCom's reported actual costs and therefore to increase WorldCom's reported earnings," Myers told Judge Richard Casey. The complaint against WorldCom's CFO and Controller (Myers) alleged fraud in connection with the sale of securities, false statements in annual and quarterly SEC reports, false statements to auditors, and false books and records. News reports have disclosed other practices which indicate the falsity of statements made in the Prospectuses/Registration Statements for all the Offerings, including WorldCom's practice of double billing customers and taking excessive merger-related charges to inflate subsequent results. WorldCom will also record write-downs of $50 billion to reflect impaired assets which have been on the Company's balance sheet at inflated values for years.  Recent news reports indicate that WorldCom's admitted accounting misstatements will total $11 billion.

5.      The Registration Statements for the Offerings were also false and misleading due to the false statements therein about WorldCom's business, acquisitions and the reasons for its purported favorable results. The Registration Statements also concealed the fact that certain of the underwriters had allocated "hot" IPO shares to WorldCom executives in exchange for the right to underwrite the Offerings and receive millions of dollars in fees. It has now been revealed that one of WorldCom's underwriters, CitiGroup, had loaned hundreds of millions of dollars to an entity controlled by WorldCom's CEO. The loans were secured by WorldCom stock, a fact not disclosed

in the offering documents. This provided additional motive for CitiGroup to help WorldCom conceal its problems.

## JURISDICTION AND VENUE

6.      The claims alleged herein arise under §§11 and 12(a)(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§77k and 77l(a)(2). Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act. In connection with the Offerings, defendants used the instrumentalities of interstate commerce and the U.S. mails. The statute (§22 of the 1933 Act) explicitly states that "[t]he district courts of the United States ... shall have jurisdiction ... *concurrent with State and Territorial courts*" of actions filed under the 1933 Act. The statute also states that "[e]xcept as provided in section 16(c), no case arising under this title and brought *in any State court* of competent jurisdiction shall be removed to any court in the United States." Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims *under state or common law. This is an individual action asserting federal law claims*. Thus, it does not fall within the definition of a "covered class action" under §16(c) and therefore is not removable to federal court under the Securities Litigation Uniform Standards Act of 1998. *See In re Waste Mgmt. Inc. Sec. Litig.*, 194 F. Supp. 2d 590 (S.D. Tex. 2002), attached as Exhibit B.

7.      The violations of law complained of herein occurred in part in the State of Illinois, including the dissemination of materially false and misleading statements complained of herein into Illinois. WorldCom and certain of the bank defendants conduct business in Illinois.

## THE PARTIES

8.      IMRF purchased WorldCom Bonds, all of which were issued pursuant to the 8/98, 5/00, 12/00 and 5/01 Registration Statements, and has suffered damages as described in Exhibit A.

9.      WorldCom is a corporation which was the issuer of the WorldCom Bonds issued pursuant to the 8/98, 5/00, 12/00 and 5/01 Registration Statements. WorldCom has filed for bankruptcy and is not named as a defendant.

10.     Defendant CitiGroup, Inc. is a large integrated financial services institution that through subsidiaries and divisions (such as defendant Salomon Smith Barney, Inc. (collectively

"CitiGroup")) provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. CitiGroup was an underwriter of the WorldCom Bonds sold in 8/98, 5/00 and 5/01.

11.     Defendant J.P. Morgan Chase & Co. is an integrated financial services institution that through subsidiaries and divisions (such as defendant J.P. Morgan Securities, Inc. (collectively "J.P. Morgan")) provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities. J.P. Morgan was an underwriter of the WorldCom Bonds sold in 8/98, 5/00, 12/00 and 5/01.

12.     Defendant Bank of America Corp. is a large integrated financial services institution that through its controlled subsidiaries and divisions (such as defendant Banc of America Securities LLC (collectively "Bank America")) provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Bank America was an underwriter of the WorldCom Bonds sold in 5/00 and 5/01.

13.     Defendant ABN/AMRO Inc. is a large integrated financial services institution that provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. ABN/AMRO was an underwriter of the WorldCom Bonds sold in 5/01.

14.     Defendant Deutsche Bank AG is a large integrated financial services institution that through its controlled subsidiaries and divisions (such as defendant Deutsche Banc Alex. Brown Inc. (collectively "Deutsche Bank")) provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Deutsche Bank was an underwriter of the WorldCom Bonds sold in 5/00 and 5/01.

15.     Defendant Lehman Brothers Holdings Inc. is a large integrated financial services institution that through its controlled subsidiaries and divisions (such as defendant Lehman Brothers Inc. (collectively "Lehman Brothers")) provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Lehman Brothers was an underwriter of the WorldCom Bonds sold in 8/98 and 5/00.

- 4 -

16.     Defendant Credit Suisse Group is a large integrated financial services institution that through its controlled subsidiaries and divisions (such as defendant Credit Suisse First Boston Corp. (collectively "Credit Suisse")) provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Credit Suisse was an underwriter of the WorldCom Bonds sold in 8/98 and 5/00.

17.     Defendant Goldman Sachs Group, Inc. is a large integrated financial services institution that through its controlled subsidiaries and divisions (such as defendant Goldman Sachs & Co. (collectively "Goldman Sachs")) provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Goldman Sachs was an underwriter of the WorldCom Bonds sold in 5/00.

18.     Defendant UBS Warburg LLC is a large integrated financial services institution that through its controlled subsidiaries and divisions (collectively "UBS Warburg") provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. UBS Warburg was an underwriter of the WorldCom Bonds sold in 5/00.

19.     Defendant NationsBanc Montgomery Securities LLC is an integrated financial services institution that through subsidiaries and divisions (collectively "NationsBanc") provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities. NationsBanc was an underwriter of the WorldCom Bonds sold in 8/98. Subsequent to the 8/98 offering, NationsBanc merged into Bank of America.

20.     Collectively defendants named in ¶¶10-19 are referred to as the "Underwriter Defendants." Each bank is sued only for bond offerings in which it participated as an underwriter. Unbeknownst to investors, as described in ¶¶146-150, certain of the banks had given WorldCom executives shares of IPO stock in other companies the banks were underwriting in exchange for underwriter business on the very offerings alleged herein.

21.     Defendant Arthur Andersen LLP ("Andersen") was WorldCom's supposedly independent accountant and provided accounting services for WorldCom prior to and in connection

- 5 -

with the 8/98, 5/00 and 5/01 offerings, which included "clean" or "unqualified" opinions on WorldCom's 12/31/98, 12/31/99 and 12/31/00 financial statements.

### THE 8/98, 5/00, 12/00 AND 5/01 OFFERINGS

22.     During 97-99, WorldCom, under the leadership of its founder and CEO, Bernard J. Ebbers ("Ebbers"), expanded very rapidly into a telecommunications giant with reported revenue, net income and earnings per share ("EPS") growth as shown below:

|            | 95      | 96       | 97      | 98         | 99        |
|------------|---------|----------|---------|------------|-----------|
| Revenue    | $3.70B  | $4.49B   | $7.35B  | $17.678B   | $33.341B  |
| Net income | $266M   | $414M*   | $357M   | $1.085B*   | $3.865B   |
| EPS        | $0.43   | $1.01*   | $0.40   | $0.85*     | $1.38     |

* Excludes acquisition-related charges.

This growth was achieved largely by WorldCom making over 70 acquisitions   using its common stock – including the acquisition of MFS Communications Co., UUNet Inc., CompuServe, MCI Communications, SkyTel Communications and CAI Wireless.

23.     By early 98, WorldCom, in fact, was facing cash flow/liquidity problems.  Because most of WorldCom's reported profits were "cash-less," *i.e.*, were due to accounting manipulations like secretly drawing down on excess reserves created in connection with previous acquisitions, lengthening the amortization period of assets to reduce current depreciation charges, improperly capitalizing operating costs and the like, WorldCom's operations were not generating sufficient cash to support the Company's expanding operations.  WorldCom thus heavily relied on borrowings from the so-called commercial paper market, a market it had access to only because WorldCom's reported assets, profitability and operating cash flow entitled it to a coveted "investment-grade" credit rating – a rating reserved only for the world's most creditworthy corporations.

### The 8/98 Offering

24.     As early as 98, WorldCom was already falsifying its financial results through a variety of accounting tricks which made WorldCom look much more profitable than it really was, while artificially inflating WorldCom's reported assets, net worth and operating cash flow.  WorldCom artificially inflated its revenues and earnings by improperly booking sales, improperly capitalizing software and "line" costs which were ordinary operating expenses, failing to write down assets

- 6 -

(goodwill) due to the impaired value of earlier acquisitions, improperly classifying assets of companies it acquired to lengthen their amortization periods, taking excessive "one-time" acquisition charges that it later secretly used to boost its "operating" earnings, failing to properly and timely account for overcharges and by improperly failing to write off receivables it could not collect. These accounting tricks overstated WorldCom's reported assets, operating earnings, cash flow and EPS.

25.    By Spring 98, WorldCom, WorldCom's top insiders, J.P. Morgan, CitiGroup, Lehman Brothers, Credit Suisse, NationsBanc, and Andersen were planning the 8/98 offering. As part of the process of preparing the 8/98 Registration Statement, these Underwriter Defendants purportedly conducted an adequate and reasonable investigation into the business operations of WorldCom, an undertaking known as a "due diligence" investigation, but in fact, did not do so. During the course of their "due diligence," these banks had continual access to confidential corporate information concerning WorldCom's business, financial condition, internal controls and its future business plans and prospects and learned of or should have learned of the falsification of WorldCom's financial condition and results and the other false and misleading statements in the 8/98 Registration Statement. Also, as a result of their status as standby lenders for WorldCom on the commercial paper back-up facilities, these banks had access to WorldCom's true financial condition, and knew or should have known it was much worse than publicly presented, which is why the banks wanted to avoid having WorldCom draw down on those credit facilities.

26.    The data below shows the bonds sold in the 8/98 offering and the monies received by WorldCom and the underwriter banks:

|  | Public Offering Price | Underwriting Fees | Proceeds to WorldCom |
|---|---|---|---|
| Note Due 2001 | $1,498,440,000 | $ 6,000,000 | $1,492,440,000 |
| Note Due 2003 | $ 599,868,000 | $ 3,600,000 | $ 596,268,000 |
| Note Due 2005 | $2,245,455,000 | $14,062,500 | $2,231,392,500 |
| Note Due 2008 | $1,733,637,500 | $15,312,500 | $1,718,325,000 |
| TOTALS: | $6,077,400,500 | $38,975,000 | $6,038,425,500 |

27.    To effectuate the 8/98 offering, WorldCom filed a Registration Statement with the SEC which became effective on 8/7/98. That 8/98 Registration Statement contained materially false

statements and material omissions, and included WorldCom's false financial results for the quarters ended 3/31/98 and 6/30/98. These financial statements artificially inflated WorldCom's assets, net income, EPS and cash flows from operations – and associated financial ratios, including its ratio of earnings to fixed charges – by using the tricks detailed in ¶¶93-132.

28.     Because these 8/98 bonds would be sold for the most part to sophisticated institutional investors, it was necessary for such a bond offering to take place for WorldCom to appear to have sufficiently large assets and earnings power to be able to pay the huge interest payments that would be due on these bonds, and that WorldCom's assets and earnings power were sufficient to retire the bonds when they became due. Maintaining WorldCom's investment-grade credit rating was absolutely indispensable to successfully completing the bond offering. Thus, WorldCom's financial position and results at 3/31/98 and 6/30/98 as presented in the 8/98 Registration Statement appeared to be very strong and consistent with its investment-grade credit rating, as set forth below:

|  | Quarter Ended 3/31/98 |
|---|---|
| Total assets | $ 25.9 billion |
| Revenue | $ 2.3 billion |
| Operating income | $426 million[*] |
| EBITDA[3] | $725 million |
| Ratio of earnings to fixed charges as of 12/31/97: | 2.09:1 |

* Excluding non-recurring charges

29.     The Registration Statement presented WorldCom as having over $25 billion in assets, and as being profitable on a continuing basis at 3/31/98. The Registration Statement also included the Company's 6/30/98 results:

> SECOND QUARTER EARNINGS. On July 23, 1998, WorldCom reported revenues for the three months ended June 30, 1998 of $2.6 billion, a 45 percent increase over revenues of $1.8 billion for the same period in 1997. Net income for the three months ended June 30, 1998 was $227.5 million, a 411 percent increase over net income before extraordinary items of $44.5 million for the same period in 1997. Prior year results have been restated to include the effects of subsequent

---

[3]     EBITDA represents earnings before interest, tax, depreciation and amortization. It is considered a superior measure of profitability because it excludes non-cash operating expenses. The measure is extremely important to analysts when considering how strong a company's results are.

business combinations accounted for as pooling-of-interest transactions. On July 30, 1998, MCI reported certain financial results for the three months ended June 30, 1998. Certain portions of the MCI press release containing such information are incorporated herein by reference to WorldCom's Current Report on Form 8-K dated August 4, 1998 (filed August 4, 1998).

30.     Based on WorldCom's apparent huge asset base and strong historical income, the WorldCom Bonds as presented in the 8/98 Prospectus/Registration Statement filed with the SEC appeared to be a very safe investment.

31.     Because WorldCom's intention to acquire MCI had been announced in 10/97, the 8/98 Registration Statement contained "pro forma" financial statements showing historical results as if the businesses of WorldCom and MCI had been combined. These results showed:

Unaudited Pro Forma Condensed Combined Balance Sheet
As of 3/31/98
(in millions)

|  | WorldCom Pro Forma Combined |
|---|---|
| Current assets | $ 7,311 |
| Property, plant & equipment, net | 18,976 |
| Goodwill & PCS licences, net | 45,411 |
| Other assets | 5,271 |
| Total Assets | $ 76,969 |

Unaudited Pro Forma Condensed Combined Statement of Operations
For the Three Months Ended 3/31/98
(in millions, except per share data)

|  | WorldCom Pro Forma Combined |
|---|---|
| Revenues | $ 7,434 |
| Operating expenses: |  |
| Line costs | 3,826 |
| Selling, general & administrative | 1,982 |
| Net income (loss) | $ (352) |
| Earnings (loss) per share – |  |
| Basic | $ (0.18) |
| Diluted | $ (0.18) |

32.     In fact, these results were false and misleading due to WorldCom's improper accounting practices as described in ¶¶93-132. The Registration Statement also represented that:

- 9 -

WorldCom is one of the first major facilities-based telecommunications companies with the capability to provide businesses with high quality local, long distance, Internet, data and international communications services over its global networks. With service to points throughout the nation and the world, WorldCom provides telecommunications products and services including: switched and dedicated long distance and local products, dedicated and dial-up Internet access, resale cellular services, 800 services, calling cards, domestic and international private lines, broadband data services, debit cards, conference calling, advanced billing systems, enhanced fax and data connections, high speed data communications, facilities management, local access to long distance companies, local access to asynchronous transfer mode ("ATM") - based backbone service, web server hosting and integration services and interconnection via Network Access Points ("NAPs") to Internet service providers ("ISPs").

33.     In addition to availing themselves of virtually unbridled access to WorldCom's internal corporate information, J.P. Morgan, CitiGroup, Lehman Brothers, Credit Suisse and NationsBanc met with WorldCom's management, top executives and Andersen, and engaged in "drafting sessions" prior to completing the 8/98 Registration Statement. During these sessions, consensus was reached as to: (i) the strategy to best accomplish the 8/98 offering; (ii) the terms of the 8/98 offering, including the price at which WorldCom Bonds would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about WorldCom would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

34.     The Registration Statement for the 8/98 offering discussed WorldCom's business and finances. The Registration Statement incorporated WorldCom's 10-Q for the quarter ended 3/31/98, and the 8-Ks filed 7/23/98 and 8/6/98. WorldCom's 1stQ 10-Q contained its financial statements for that quarter. The 7/23/98 8-K included the press release announcing WorldCom's financial results for the quarter ending 6/30/98.

35.     WorldCom's 7/23/98 8-K, which was incorporated by reference into the Registration Statement, stated:

WorldCom, Inc. today reported second quarter revenues of $2.61 billion, a 45 percent increase over second quarter 1997 revenues of $1.80 billion. Prior year results include the Brooks Fiber merger, which was completed on January 29, 1998, and accounted for as a pooling-of-interests transaction. Traffic for the second quarter increased 39 percent over the previous year. Internal growth was particularly strong across all sectors of communications services. Accelerating internal growth, combined with the benefits of the CNS/ANS transactions for the full quarter, contributed to the impressive year-over-year reported core revenue gains of 52 percent. On a pro forma basis, assuming the acquisitions of CNS and ANS occurred

- 10 -

as of the beginning of the year for both periods – which is indicative of internal growth – core communications services revenues increased 38 percent on industry leading volume growth of 39 percent.

Reported net income for the second quarter 1998 was $228 million or $0.21 per common share compared with net income before extraordinary items of $44 million or $0.04 per common share in the second quarter of 1997.

Operating income for the second quarter 1998 was $494.8 million – an increase of 127 percent compared with $218.3 million on a reported basis for the second quarter of 1997.

The improvement in operating income margins over the past year is due to a significant improvement in year-over-year operating cash flow and the fixed level of annual amortization. A more profitable mix of non-access bearing revenues combined with the achievement of cost savings has driven the increase in EBITDA margins.

*   *   *

As a percent of revenues, EBITDA margin for the second quarter of 1998 was 32 percent and operating income 19 percent compared with 25 percent and 10 percent, respectively, for the prior year period. The improvement in operating income is due to the realization of merger synergies, an improving mix of higher margin revenues, and the operating leverage related to the fixed quarterly level of amortization expense.

36.     Contrary to these statements, WorldCom did not have all the capabilities represented but was falsely portraying itself through various financial manipulations described in ¶¶93-132.

**The 5/00 Offering**

37.     By late 99, WorldCom, WorldCom's top insiders, the banks, and Andersen were planning the 5/00 offering. As part of the process of preparing the 5/00 Registration Statement, the Underwriter Defendants purportedly conducted an adequate and reasonable investigation into the business and operations of WorldCom, an undertaking known as a "due diligence" investigation, but in fact, did not do so. During the course of their "due diligence," the banks had continual access to confidential corporate information concerning WorldCom's business, financial condition, internal controls and its future business plans and prospects and learned of or should have learned of the falsification of WorldCom's financial condition and results and the other false and misleading statements in the 5/00 Registration Statement. Also, as a result of their status as standby lenders for WorldCom on the commercial paper back-up facilities, the banks had access to WorldCom's true

financial condition, and knew or should have known it was much worse than publicly presented, which is why the banks wanted to avoid having WorldCom draw down on those credit facilities.

38.     By the Spring of 00, WorldCom's liquidity was impaired and it needed to raise cash to pay down its mounting commercial paper debt.  On 5/12/00, WorldCom and its investment bankers (J.P. Morgan, CitiGroup, Bank America, Deutsche Bank, Credit Suisse, Lehman Brothers, Goldman Sachs and UBS Warburg) sold $3.5 billion in bonds – $1.0 billion of 7.875% notes due 2003, $1.25 billion of 8.0% notes due 2006, and $1.25 billion of 8.25% notes due 2010.  The investment bankers pocketed $15 million in fees from the sale of these bonds, while WorldCom got the cash it needed to pay off its commercial paper debt and restore its liquidity.

39.     As is the case with any large commercial paper borrower, WorldCom had in place a commercial paper back-up credit facility, i.e., in WorldCom's case, a $12 billion unsecured lending commitment from its banks (J.P. Morgan, CitiGroup, Bank America, Deutsche Bank and ABN/AMRO), which permitted it to draw down on that facility to pay off its commercial paper debt if necessary.  However, this line had never been drawn down upon, enabling WorldCom's lending banks to sit back and comfortably collect a commitment fee of .25%, or approximately $25-$30 million per year, monies they pocketed without incurring any actual credit risk exposure to WorldCom.

40.     However, if WorldCom began to draw down on its commercial paper back-up facility, this would put the banks very much at risk of a major loss, as they knew from their long association with WorldCom and involvement in its financial and business affairs that WorldCom's actual financial condition was far, far worse and much more highly leveraged and dangerous than had been publicly disclosed.  While the banks would have received interest payments on the loans had the facility been drawn down upon, interest rates at that time were very low and commercial lending was the least profitable part of these banks' operations.  Thus, these interest rates could not possibly adequately compensate the banks for the true credit risk they knew they would be taking in making billions of dollars of loans to WorldCom.

41.     The data below shows the bonds sold in the 5/00 offering and the monies received by WorldCom and the underwriter banks:

- 12 -

|  | Public Offering Price | Underwriting Fees | Proceeds To WorldCom |
|---|---|---|---|
| Floating Rate Notes | $1,500,000,000 | $ 2,250,000 | $1,497,750,000[4] |
| 7.875% Notes | $ 995,410,000 | $ 2,500,000 | $ 992,910,000 |
| 8.000% Notes | $1,236,687,500 | $ 4,687,500 | $1,232,000,000 |
| 8.250% Notes | $1,231,112,500 | $ 5,625,000 | $1,225,487,500 |
| **Combined Totals** | **$4,963,210,000** | **$15,062,500** | **$4,948,147,500** |

42.    In connection with the 5/00 offering, WorldCom filed a Registration Statement with the SEC which became effective on 5/12/00. That Registration Statement contained materially false statements and material omissions, and included WorldCom's false financial statements for the year ended 12/31/99 and the 1stQ 00. These financial statements artificially inflated WorldCom's assets, net income, EPS and cash flows from operations – and associated financial ratios, including its ratio of earnings to fixed charges. WorldCom artificially inflated its revenues and earnings by improperly booking sales, improperly capitalizing ordinary operating costs, failing to write down assets (goodwill) due to the impaired value of earlier acquisitions, improperly re-classifying assets of companies it acquired to lengthen their amortization periods, taking excessive "one-time" acquisition charges that it later secretly used to boost its "operating" earnings, failing to timely record refunds due customers and by improperly accounting for receivables it could not collect.

43.    Because these bonds would be sold for the most part to sophisticated institutional investors, it was necessary for such a bond offering for WorldCom to appear to have sufficiently large assets and earnings power to be able to pay the huge interest payments that would be due on these bonds, and that WorldCom's assets and earnings power were sufficient to retire the bonds when they became due.   Maintaining WorldCom's investment-grade credit rating was absolutely indispensable to successfully completing the bond offering. Thus, WorldCom's financial position and results at 12/31/99 and 3/31/00 as presented in the 5/00 Registration Statement appeared to be very strong and consistent with its investment-grade credit rating, as set forth below:

---

[4]    The Floating Rate Notes matured in 01 prior to WorldCom's bankruptcy.

|  | Year Ended 12/31/99 | Quarter Ended 3/31/00 |
|---|---|---|
| Total assets | $91.0 billion | $94.5 billion |
| Revenue | $37.1 billion | $ 9.98 billion |
| Operating income | $ 7.8 billion | $ 2.4 billion |
| Diluted EPS | $1.35 | $0.44 |
| Ratio earnings/ |  |  |
| Fixed charges | 5.75:1 | 7.01:1 |

44.    The 5/00 Registration Statement contained the following WorldCom financial results:

| (in millions, except for per share data) | At or For the Three Months Ended 3/31, (unaudited) 2000 | 1999 | At or For the Year Ended 12/31, 1999 |
|---|---|---|---|
| **OPERATING RESULTS:** |  |  |  |
| Revenues | $9,978 | $9,122 | $37,120 |
| Operating income (loss) | 2,440 | 1,510 | 7,888 |
| Income (loss) before cumulative effect of accounting change and extraordinary items | 1,301 | 730 | 4,013 |
| Net income (loss) applicable to common shareholders | 1,284 | 712 | 3,941 |
| **EARNINGS (LOSS) PER COMMON SHARE:** |  |  |  |
| Net income (loss) – |  |  |  |
| Basic | 0.45 | 0.25 | 1.40 |
| Diluted | 0.44 | 0.24 | 1.35 |
| **FINANCIAL POSITION:** |  |  |  |
| Total assets | $94,512 |  | $91,072 |
| Long-term debt | 13,514 |  | 13,128 |
| Shareholders' investment | 53,052 |  | 51,238 |
| Ratio of earnings to fixed charges* | 7.01:1 | 3.96:1 | 5.75:1 |

- - - - - - - - - -

\*    For the purpose of computing the ratio of earnings to fixed charges, earnings consist of pretax income (loss) from continuing operations, excluding minority interests in losses of consolidated subsidiaries, and fixed charges consist of pretax interest, including capitalized interest, on all indebtedness, amortization of debt discount and expense, and that portion of rental expense which WorldCom believes to be representative of interest.

45.    The 5/00 Registration Statement contained the following WorldCom/Sprint pro forma financial results:

Unaudited Pro Forma Condensed Combined Balance Sheet
As of 3/31/00
(in millions)

| | WorldCom Historical | Sprint Historical | Pro Forma Adjustments | WorldCom Pro Forma Combined |
|---|---|---|---|---|
| Current assets | $11,110 | $ 4,988 | $ – | $ 16,098 |
| Property. plant & equipment, net | 30,909 | 22,432 | – | 53,341 |
| Goodwill & PCS licences, net | 42,865 | 8,406 | (8,406) 107,602 | 150,467 |
| Other intangibles, net | 4,304 | 1,123 | – | 5,427 |
| Other assets | 5,324 | 1,765 | – | 7,089 |
| Total assets | $94,512 | $38,714 | $99,196 | $232,422 |
| Total shareholders' equity | 53,052 | 14,223 | 99,196 | 166,471 |
| Total liabilities & shareholders' equity | $94,512 | $38,714 | $99,196 | $232,422 |

Unaudited Pro Forma Condensed Combined Statement of Operations
For the Three Months Ended 3/31/00
(in millions, except per share data)

| | WorldCom Historical | Sprint FON Historical | Pro Forma Adjustments | WorldCom Pro Forma Combined |
|---|---|---|---|---|
| Revenues | $ 9,978 | $ 4,397 | $ (133) | $ 14,242 |
| Operating expenses: | | | | |
| Line costs | 4,092 | 2,031 | (133) | 5,990 |
| Selling, general & administrative | 2,299 | 1,063 | – | 3,362 |
| Net income (loss) Applicable to common shareholders before discontinued operations & extraordinary items | $ 1,284 | $ 447 | $ (731) | $ 1,000 |
| Earnings (loss) per share – | | | | |
| Basic | $ 0.45 | $ 0.51 | | $ 0.23 |
| Diluted | $ 0.44 | $ 0.50 | | $ 0.22 |

Unaudited Pro Forma Condensed Combined Statement of Operations
For the Year Ended 12/31/99
(in millions, except for per share data)

| | WorldCom Historical | Sprint FON Historical | Pro Forma Adjustments | WorldCom Pro Forma Combined |
|---|---|---|---|---|
| Revenues | $37,120 | $17,016 | $ (536) | $ 53,600 |
| Operating expenses: | | | | |
| Line costs | 15,951 | 7,724 | (536) | 23,139 |
| Selling, general & administrative | 8,935 | 4,233 | – | 13,168 |

- 15 -

| | | | | |
|---|---|---|---|---|
| Operating income (loss) | 7,888 | 2,930 | (2,923) | 7,895 |
| Earnings (loss) per share: | | | | |
| Basic | $ 1.40 | $ 2.01 | | $ 0.64 |
| Diluted | $ 1.35 | $ 1.97 | | $ 0.62 |

46.     Based on WorldCom's apparent huge asset base and strong historical earnings, the WorldCom Bonds as presented in the 5/00 Registration Statement filed with the SEC to sell these "investment-grade" bonds appeared to be a very safe investment. The Registration Statement contained *no risk factors* with respect to investment in the WorldCom Bonds. The Registration Statement presented WorldCom as having over $94 billion in assets, as being very profitable and as having an "earnings-to-fixed-charges ratio" at 12/31/99 – the key financial measure of the safety of a debt issuance – of 5.75 to 1, a very strong ratio.

47.     The 5/00 Registration Statement also contained Sprint's 1stQ 00 results:

Unaudited Pro Forma Condensed Combined Statement of Operations
For the Three Months Ended 3/31/00
(in millions, except per share data)

| | Sprint FON Historical |
|---|---|
| Revenues | $   4,397 |
| Operating expenses: | |
| Line costs | 2,031 |
| Selling, general & administrative | 1,063 |
| Net income (loss) | |
| Applicable to common shareholders | |
| before discontinued operations & | |
| extraordinary items | $     447 |
| Earnings (loss) per share – | |
| Basic | $   0.51 |
| Diluted | $   0.50 |

48.     By the time of this offering, loans to Ebbers' personal holding company, Joshua Timberlands, by a CitiGroup entity (Travelers Insurance) had reached $679 million, as described in ¶85. Despite CitiGroup's role as lead underwriter, this loan was not disclosed.

49.     In addition to availing themselves of virtually unbridled access to WorldCom's internal corporate information, the banks met with WorldCom's management, top executives and Andersen and engaged in "drafting sessions" prior to completing the 5/00 Registration Statement.

- 16 -

During these sessions, consensus was reached as to: (i) the strategy to best accomplish the 5/00 offering; (ii) the terms of the 5/00 offering, including the price at which WorldCom Bonds would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about WorldCom would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

50.     The 5/00 Registration Statement also made it appear likely that the Department of Justice ("DOJ") would approve WorldCom's acquisition of Sprint. It stated:

> Consummation of the Sprint merger is subject to various conditions set forth in the merger agreement with Sprint, including the adoption of the merger agreement by stockholders of Sprint, the approval of the Sprint merger by shareholders of WorldCom, the approval of the issuance of WorldCom capital stock in the Sprint merger by shareholders of WorldCom, certain U.S. and foreign regulatory approvals and other customary conditions. On April 28, 2000, special meetings of the shareholders of WorldCom and Sprint were held and the merger proposals were adopted and approved. It is anticipated that the Sprint merger will close in the second half of 2000. Additionally, if the Sprint merger is consummated, the integration and consolidation of Sprint would require substantial management and financial resources and involve a number of significant risks, including potential difficulties in assimilating technologies and services of Sprint and in achieving anticipated synergies and cost reductions.

51.     In fact, the Sprint merger faced significant regulatory hurdles and its consummation was highly suspect. WorldCom's stock had appreciated significantly on the news and would decline if the merger was blocked. The decline in WorldCom's stock price would make (and did make) the Company's debt securities less attractive. Nonetheless, WorldCom was successful in completing the 5/00 offering, raising $4.9 billion in proceeds.

**The 12/00 and 5/01 Offerings**

52.     In 7/00, the DOJ announced it would block WorldCom's acquisition of Sprint. In doing so, the Justice Department publicly stated that the long-distance industry had become over concentrated and that it would not permit any further substantial mergers in that industry. This meant that WorldCom's growth-by-acquisition strategy had come to an end. WorldCom stock collapsed, falling to just $13 1/2 by the end of 00. This collapse ended any possibility that WorldCom could continue to make non-dilutive acquisitions using its stock.

53.     By year-end 00, WorldCom in fact was facing a cash flow/liquidity crisis. Because most of WorldCom's reported profits continued to be "cash-less," *i.e.*, were due to accounting

- 17 -

manipulations like secretly drawing down on excess reserves created in connection with previous acquisitions, lengthening the amortization period of assets to reduce current depreciation charges, improperly capitalizing operating costs and the like, WorldCom's operations were not generating sufficient cash to support the Company's expanding operations. WorldCom had been falsifying its financial results for years; thus, WorldCom's 99 and 00 results were false in material respects. WorldCom artificially inflated its revenues and earnings by improperly booking sales, improperly capitalizing software and "line" costs which were ordinary operating expenses, failing to write down assets (goodwill) due to the impaired value of earlier acquisitions, improperly classifying assets of companies it acquired to lengthen their amortization periods, taking excessive "one-time" acquisition charges that it later secretly used to boost its "operating" earnings, failing to properly and timely account for customer refunds due to overcharges and improperly failing to write off receivables it could not collect. These accounting tricks overstated WorldCom's reported assets, operating earnings, cash flow and EPS.

54.      To make matters worse, during the last half of 00, price competition in the long-distance business intensified, raising investor concerns as to the long-term profitability of long-distance providers like WorldCom's MCI subsidiary. Thus, WorldCom could no longer grow by acquiring other companies and, at the same time, the business fundamentals of its core operations were deteriorating.

55.      However, during the balance of 00, following the sale of the bonds in 5/00, WorldCom continued to consistently report strong growth in revenues, strong cash flow and income from operations and strong EPS. As a result, it continued to maintain its "investment-grade" credit rating.

56.      To make matters worse, in late 00/early 01, due to the collapse of WorldCom stock, Ebbers (WorldCom's founder and CEO), defaulted on a $350+ million margin loan he had secretly taken out earlier in 00 from Bank America, secured by millions of shares of his WorldCom stock. To bail himself out, Ebbers forced WorldCom to pay off and thus assume his huge margin loan, thus further exacerbating WorldCom's cash flow/liquidity problem, and putting enormous pressure on

Ebbers and the entire WorldCom Board to shore up WorldCom's financial condition to help support its stock price so it would not decline any further.

57.     As a result of WorldCom's cash flow problems, by late 00/early 01, WorldCom's commercial paper and other short-term debt had ballooned to by far its highest levels ever, *i.e.*, $9-$10 billion, and while WorldCom had been able to borrow in the commercial paper market because its apparent huge asset base and strong earnings power entitled it to an "investment-grade" credit rating, by late 00/early 01, WorldCom's short-term debt had reached such levels that WorldCom's ability to continue to expand its borrowing in this market was at or near an end.

58.     While WorldCom had in place a commercial paper back-up facility, *i.e.*, a $12 billion unsecured lending commitment from its banks (J.P. Morgan, CitiGroup, Bank America, Deutsche Bank and ABN/AMRO), which permitted it to draw down on that facility to pay off its commercial paper debt if necessary, that line had never been drawn down upon, enabling WorldCom's lending banks to sit back and comfortably collect a commitment fee of .25%, or approximately $25-$30 million per year, monies they pocketed without incurring any actual credit risk exposure to WorldCom.

59.     The banks knew, however, if WorldCom began to draw down on its commercial paper back-up facility, this would put the banks very much at risk of a major loss, as they knew from their long association with WorldCom and involvement in its financial and business affairs that WorldCom's actual financial condition was far, far worse and much more highly leveraged and dangerous that had been publicly disclosed. While the banks would have received interest payments on the loans had the facility been drawn down upon, interest rates at that time were very low and commercial lending was the least profitable part of these banks' operations. Thus, these interest rates could not possibly adequately compensate the banks for the true credit risk they knew they would be taking in making billions of dollars of loans to WorldCom. In 12/00, J.P. Morgan arranged a $2 billion offering for WorldCom.

60.     To effectuate the 12/00 offering, defendants disseminated an Offering Memorandum dated 12/14/00. Delivery of the $2 billion in notes was to occur on 12/19/00. The data below shows the bonds sold in the 12/00 offering and the monies received by WorldCom:

|  | Public Offering Price |
|---|---|
| 7-3/8% Dealer Remarketable Securities due 2011 | $ 999,060,000 |
| 7-3/8% Notes due 2006 | $ 997,400,000 |
|  | $1,996,460,000 |

61.     The 12/00 Offering Memorandum incorporated by reference WorldCom's 99 Form 10-K and 3/31/00, 6/30/00 and 9/30/00 Forms 10-Q, which included WorldCom's financial results for 99 and the first three quarters of 00.  As described in ¶¶93-132, these financial results were materially false and misleading.

62.     By early 01, WorldCom desperately needed to raise cash to restore its liquidity by paying down its commercial paper and other short-term debt.  However, WorldCom's banks did not want WorldCom to borrow from them. So, WorldCom and its banks began to quickly work together to find a way to raise the capital WorldCom needed – but *from public investors*.  Since WorldCom's common stock had collapsed, a sale of equity was out of the question as it would have been grossly dilutive.  So, it was decided to undertake a massive bond offering – the largest corporate bond issuance in the history of the United States and a bond offering that could only be accomplished if the WorldCom Bonds to be sold were rated "investment grade" by the rating agencies and WorldCom's financial condition appeared to be very strong and its overall business succeeding, despite intensifying long-distance price competition.

63.     During early 01, WorldCom and the banks put together this largest corporate bond issuance in U.S. history.  On 5/9/01, they sold about $12 billion worth of WorldCom Bonds. The banks pocketed $70 million of the proceeds in underwriting fees. WorldCom took the proceeds and used approximately $10 billion to pay off its commercial paper and other short-term debt, leaving it with $2 billion in cash and giving it ongoing access to the commercial paper market for continued borrowing. There was no draw-down on WorldCom's commercial paper back-up facility with its banks.

- 20 -

64.     The banks which acted as the lead underwriters for the 5/01 bond issuance were J.P.
Morgan, CitiGroup, Bank America, Deutsche Bank and ABN/AMRO.  The data below shows the
bonds sold in the 5/01 offering and the monies received by WorldCom and the banks:

| | Public Offering Price | Underwriting Fees | Proceeds to WorldCom (before expenses) |
|---|---|---|---|
| U.S. dollar 6.50% notes due 2004 | $1,497,345,000 | $3,750,000 | $1,493,595,000 |
| U.S. dollar 7.50% notes due 2011 | $3,956,160,000 | $18,000,000 | $3,938,160,000 |
| U.S. dollar 8.25% notes due 2031 | $4,512,508,000 | $40,250,000 | $4,472,258,000 |
| Euro 6.75% notes due 2008 | €1,248,987,500 | €5,000,000 | €1,243,987,500 |
| Sterling 7.25% notes due 2008 | £498,850,000 | £2,000,000 | £496,850,000 |
| **Combined Totals** | **$9,966,013,000** | **$62,000,000** | **$9,904,013,000** |
| | €1,248,987,500 | €5,000,000 | €1,243,987,500 |
| | £498,850,000 | £2,000,000 | £496,850,000 |

65.     In connection with the 5/01 offering, WorldCom filed a Registration Statement with
the SEC which became effective on 5/9/01.  That Registration Statement contained materially false
statements and material omissions, and included WorldCom's false financial statements for the year
ended 12/31/00 and the 1stQ 01.  These financial statements artificially inflated WorldCom's assets,
net income, EPS and cash flows from operations – and associated financial ratios, including its ratio
of earnings to fixed charges.  WorldCom artificially inflated its revenues and earnings by improperly
booking sales, improperly capitalizing ordinary operating costs, failing to write down assets
(goodwill) due to the impaired value of earlier acquisitions, improperly re-classifying assets of
companies it acquired to lengthen their amortization periods, taking excessive "one-time" acquisition
charges that it later secretly used to boost its "operating" earnings, failing to timely record refunds
due customers and improperly accounting for receivables it could not collect.

66.     However, the planned bond offering was one of the largest in history and included
billions of dollars of bonds not due until 2011 and 2031.  Because these bonds would be sold for the
most part to sophisticated institutional investors, it was necessary for such a bond offering for
WorldCom to appear to have sufficiently large assets and earnings power to be able to pay the huge

- 21 -

interest payments that would be due on these bonds, and that WorldCom's assets and earnings power were sufficient to retire the bonds when they became due. Maintaining WorldCom's investment-grade credit rating was absolutely indispensable to successfully completing the bond offering. Thus, WorldCom's financial position and results at 12/31/00 and 3/31/01 as presented in the 5/01 Registration Statement appeared to be very strong and consistent with its investment-grade credit rating, as set forth below:

|  | Year Ended 12/31/00 | Quarter Ended 3/31/01 |
|---|---|---|
| Total assets | $98.9 billion | $99.5 billion |
| Revenue | $39.0 billion | $ 9.7 billion |
| Operating income | $ 8.1 billion | $ 1.4 billion |
| Diluted EPS | $1.43 | $0.25 |
| Ratio earnings/ Fixed charges | 5.25:1 | n/a |

67.   In addition to these favorable financial results, the 5/01 Registration Statement also presented other favorable aspects of WorldCom's business:

- WorldCom's 1stQ 01 results were an "excellent start," showing that WorldCom "is on track to deliver strong growth and solid performance throughout the year."

- WorldCom group had "achieved [its] growth targets" and had "strong" 1stQ 01 results.

- The MCI group "made excellent progress adjusting ... business to maximize and maintain profitability and cash flow as far into the future as possible."

- WorldCom was "well positioned to capitalize on growth opportunities."

- "The businesses attributed to the MCI group have significant assets."

- The breadth and scale of its services "differentiate [WorldCom's] offerings from those of [its] competitors."

- "We believe our sales and marketing capabilities are one of our strongest competitive advantages."

- Total revenues in 00 increased from 99 due to "internal growth of the WorldCom Group."

- WorldCom was positioned to use its "global assets and ... customer base" to lead a new generation of fast growing e-commerce and data driven markets.

68.   Based on WorldCom's apparent huge asset base and strong historical earnings, the WorldCom Bonds as presented in the 5/01 Registration Statement filed with the SEC to sell these

"investment-grade" bonds appeared to be a very safe investment. The Registration Statement contained *no risk factors* with respect to investment in the WorldCom Bonds. The Registration Statement presented WorldCom as having over $99 billion in assets, as being very profitable and as having an "earnings-to-fixed-charges ratio" – the key financial measure of the safety of a debt issuance – of 5.25 to 1, a very strong ratio.

69.     WorldCom, however, had $12 billion in unsecured commercial paper back-up credit facilities, led by CitiGroup, J.P. Morgan and Bank America, for which the banks received an annual commitment fee of .25% or $30 million per year. WorldCom's commercial paper back-up credit facility had never been drawn down upon by WorldCom and thus the banks had never faced any true credit risk exposure to WorldCom. However, given the deterioration in WorldCom's business and the ballooning of its short-term debt to $9 billion, WorldCom would soon have to begin to draw down billions of dollars on its unsecured commercial paper back-up facility, which would expose the banks to a very substantial risk of loss given WorldCom's true financial condition. The banks wanted to avoid this if at all possible.

70.     Thus, by late 00/early 01, WorldCom, Ebbers, J.P. Morgan, CitiGroup, Bank America, ABN/AMRO, Deutsche Bank and Andersen began to work quickly to put together a huge public debt offering to raise billions of dollars of *long-term* capital for WorldCom, so WorldCom could pay off its ballooning short-term debt and so WorldCom would not have to draw down on the unsecured commercial paper back-up facilities.

71.     By late 00, WorldCom, WorldCom's top insiders, the banks, and Andersen were planning the 5/01 offering. As part of the process of preparing the 5/01 Registration Statement, the Underwriter Defendants purportedly conducted an adequate and reasonable investigation into the business and operations of WorldCom, an undertaking known as a "due diligence" investigation, but in fact, did not do so. During the course of their "due diligence," the banks had continual access to confidential corporate information concerning WorldCom's business, financial condition, internal controls and its future business plans and prospects and learned of or should have learned of the falsification of WorldCom's financial condition and results and the other false and misleading statements in the 5/01 Registration Statement. Also, as a result of their status as standby lenders for

- 23 -

WorldCom on the commercial paper back-up facilities, the banks had access to WorldCom's true financial condition, and knew or should have known it was much worse than publicly presented, which is why the banks wanted to avoid having WorldCom draw down on those credit facilities.

72.    In addition to availing themselves of virtually unbridled access to WorldCom's internal corporate information, the banks met with WorldCom's management and top executives and Andersen, and engaged in "drafting sessions" prior to completing the 5/01 Registration Statement. During these sessions, consensus was reached as to: (i) the strategy to best accomplish the 5/01 offering; (ii) the terms of the 5/01 offering, including the price at which WorldCom Bonds would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about WorldCom would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

73.    The Registration Statement for the 5/01 offering discussed WorldCom's business and finances. The Registration Statement incorporated WorldCom's 10-K for the year ended 12/31/00, and the 8-Ks filed 4/26/01 and 5/1/01. WorldCom's 00 10-K contained its audited financial results for 99 and 00. The 4/26/01 8-K included the press release announcing WorldCom's financial results for the quarter ending 3/31/01.

74.    WorldCom's 4/26/01 8-K, which was incorporated by reference into the Registration Statement, stated:

### *WORLDCOM GROUP FIRST QUARTER 2001 REVENUES UP 12 PERCENT, ACHIEVING GROWTH TARGETS AND DELIVERING SOLID RESULTS.*

### *WORLDCOM, INC. REPORTS FIRST QUARTER CASH EPS OF 35 CENTS.*

... WorldCom, Inc., the leading global digital and data communications provider, today announced financial results for the quarter ended March 31, 2001.

\*    \*    \*

### WORLDCOM GROUP RESULTS

WorldCom group, which includes the Company's high-growth data, Internet and international operations, as well as commercial voice services, reported revenues of $6.1 billion, a 12 percent increase from the same period in 2000. This *strong result* was driven by 22 percent year-over-year revenue growth in data and Internet services and 19 percent revenue growth in international services.

Data and Internet services accounted for $2.8 billion or 45 percent of WorldCom group's revenues, up from 42 percent in the first quarter of 2000. *Revenue growth in these fast-growing services continues to lead the industry ....*

\*   \*   \*

WorldCom group reported cash earnings (earnings before goodwill amortization) of $865 million or 30 cents per share. WorldCom group net income, after goodwill amortization, was $638 million or 22 cents per share in the quarter.

MCI GROUP RESULTS

MCI group, the Company's consumer, small business, wholesale long distance, wireless messaging and dial-up Internet access businesses, reported revenues of $3.6 billion, versus $4.2 billion in the same period last year. *Contrary to industry trends, MCI group consumer subscription long distance and local services reported revenue growth.*

\*   \*   \*

CONSOLIDATED WORLDCOM, INC. RESULTS

First quarter 2001 consolidated revenues were $9.7 billion, up from $9.6 billion in the same period of 2000. Consolidated EBITDA was $2.9 billion, representing an EBITDA margin of 30 percent.

First quarter 2001 cash earnings were $1.0 billion, or 35 cents per share. Consolidated net income, after goodwill amortization, was $729 million or 25 cents per share in the quarter.

MANAGEMENT'S COMMENTS

*"This quarter was an excellent start to what will be a pivotal year for WorldCom. These results show that WorldCom is on track to deliver strong growth and solid performance throughout the year,"* said Bernard J. Ebbers, president and CEO of WorldCom, Inc.

*"On the WorldCom group side we achieved our growth targets, adding $237 million in revenues since the fourth quarter – the largest sequential increase we've delivered in a year."*

*"And on the MCI group side we made excellent progress adjusting our businesses to maximize and maintain profitability and cash flow as far into the future as possible."*

75.    With respect to the Company's recent results, the Registration Statement stated:

## Recent Developments

The following information reflects selected results for the quarter ended March 31, 2001 for the WorldCom group, the MCI group and WorldCom as a whole.

WorldCom group reported first quarter 2001 revenues of $6.1 billion, a 12 percent increase from the same period in 2000. This *strong result* was driven by

- 25 -

22 percent year-over-year revenue growth in data and Internet services and 19 percent revenue growth in international services.

\* \* \*

### Selected Historical Financial Data

\* \* \*

In reading the following selected financial data, please note the following:

\* \* \*

--      Results for 2000 include ... a $685 million pre-tax charge associated with specific domestic and international wholesale accounts that were no longer deemed collectible due to bankruptcies, litigation and settlements of contractual disputes that occurred in the third quarter of 2000.

\* \* \*

|  | AT OR FOR THE YEAR ENDED DECEMBER 31, | |
|  | 1999 | 2000 |
|  | (IN MILLIONS, EXCEPT PER SHARE DATA) | |
|---|---|---|
| **OPERATING RESULTS:** | | |
| Revenues | $35,908 | $39,090 |
| Operating income (loss) ... | 7,888 | 8,153 |
| | | |
| **EARNINGS (LOSS) PER COMMON SHARE:** | | |
| Net Income (Loss) – | | |
| Basic | 1.40 | 1.43 |
| Diluted | 1.35 | 1.40 |
| **FINANCIAL POSITION:** | | |
| Total assets | $91,072 | $98,903 |
| Shareholders' investment | 51,238 | 55,409 |
| Ratio of earnings to fixed charges | 5.75:1 | 5.25:1 |

76.     Furthermore, WorldCom's 00 10-K, which was incorporated by reference in the Registration Statement, contained the following statements regarding WorldCom's business:

*We believe we are positioned to use those global assets and our customer base to lead the new generation of fast growing, e-commerce and data-driven segments of the communications industry.*

\* \* \*

Using our Internet protocol infrastructure, we intend to continue our expansion into high growth, next generation services, such as virtual private

- 26 -

networks which use Internet protocol technology, web centers that allow customers to interact with sales and service agents over the Internet, the telephone or mail, and Internet content delivery services. *We believe the breadth and scale of these services differentiate our offerings from those of our competitors and meet our customers' increasingly complex communications needs, highlighting the unique quality and reach of our networks.*

*We are positioning the company for leadership in the high growth segments of our industry. Our proposed merger with Intermedia Communications and resulting controlling interest in Digex will provide us with a strong foothold in the expanding managed hosting arena.*

\*   \*   \*

Domestic connections using Internet protocol technology are expected to grow at an annual rate of approximately 27% from $13.5 billion in 1998 to approximately $46.3 billion by 2003, according to market studies by Probe Research. Much of the growth is expected to result from increased demand for e-mail, web hosting services, e-commerce, collaborative workflow and real-time video services and applications. We believe that most of the growth in data communications will be driven by corporations' demand for high quality and scalable Internet-based infrastructure and services, including web hosting and other managed network services. *We are well positioned to capitalize on these growth opportunities and to shape the future of global digital communications due to our network, global customer base, tradition of innovation and corporate strategy to target and lead the high end of data-driven emerging communications segments.*

\*   \*   \*

Our management's mandate is to use our existing market positions and assets opportunistically to optimize cash flow, while retiring the debt attributed to the MCI group. Available cash flow, after debt and interest repayments, will be available for dividend payments and possible share repurchases. *The businesses attributed to the MCI group have significant assets*, including the nationally recognized brand, extensive customer relationships, 20 call centers with highly effective sales representatives and a tradition of developing innovative calling plans that enhance customer retention. *Management believes it can leverage these strengths to deliver new services and to bundle existing services.*

\*   \*   \*

*We believe our sales and marketing capabilities are one of our strongest competitive advantages.* Telemarketing is a fundamental component of the sales effort for residential and small business customers. Typically, roughly 50% of our residential and small business installations are sold through some 8,500 telemarketers based in 20 call centers nationwide. Our marketing partners, in turn, are a key competitive advantage for differentiating long distance sales, offering consumers the opportunity to earn frequent flyer miles, free video rentals, and similar awards based on long distance usage. Over 50% of subscription long distance minutes are generated by our 7.5 million partner customers.

\*   \*   \*

- 27 -

*REVENUES. Revenues for 2000 increased 15.3% to $22.8 billion versus $19.7 billion for the same period in the prior year. The increase in total revenues is attributable to internal growth of the WorldCom group.*

77.     The 5/01 Registration Statement was false or misleading, as set forth below.

78.     After the WorldCom Bonds were sold, WorldCom in 7/01 reported strong 2ndQ 01 results, along with strong cash flow. In 10/01, it announced strong 3rdQ 01 results with strong cash flow. In 1/02, WorldCom announced profitable 4thQ 01 and 01 results and strong cash flow. As a result, at the end of 1/02, the WorldCom Bonds sold to investors in 5/00 and 5/01 were selling at or slightly above par.

**The Truth Begins to Be Revealed**

79.     In 2/02 there began a series of revelations that quickly destroyed WorldCom. In 2/02, WorldCom slashed its 02 revenue and earnings forecasts and revealed it was going to take a $15-$20 billion write-down for the impaired value of prior acquisitions. In 3/02, it was revealed that the SEC was investigating WorldCom's accounting practices. In 4/02, WorldCom slashed its 02 revenues and earnings forecasts even further and analysts indicated that WorldCom's asset write-downs due to the impaired value of its prior acquisitions would now exceed $45 billion. In short order, WorldCom's credit rating was downgraded by the rating agencies to "junk" status and the WorldCom Board was forced to oust Ebbers in an effort to save the Company's credibility – allowing him to leave with a $408 million loan from WorldCom *and* a deal to be paid $1.5 million a year for as long as he lives. In 5/02, WorldCom Bonds were further downgraded – now to "junk" status. As a result of these revelations, WorldCom Bonds plunged, losing approximately 50% of their value by early 5/02.

80.     Then, by 6/25/02, *WorldCom admitted it had engaged in one of the largest financial falsifications in history – overstating its earnings and operating cash flow by billions of dollars* in 01 and the 1stQ 02 by improperly capitalizing normal operating expenses. WorldCom has now admitted that its 1stQ 01 financial statements in the 5/01 Registration Statement were materially false and that it improperly disguised ordinary operating expenses as capital assets in the amount of $771 million in the 1stQ 01. This practice not only inflated earnings but inflated the cash flows WorldCom reported from operations. WorldCom reported operating income of $1.281 billion and cash flows from operations of $1.596 million in the 1stQ 01. Thus, by 6/02, WorldCom had

admitted falsification of WorldCom's 1stQ 01 results overstated its operating income by at least 60% and its cash flows from operations by at least 48%! This revelation resulted in the ouster of WorldCom's chief financial officer and its controller. WorldCom Bonds now collapsed even further, to just $120-$200 per bond. The SEC publicly condemned this financial manipulation and sued WorldCom for fraud, stating WorldCom had "falsely portrayed itself as a profitable business." President Bush condemned these "outrageous" and "egregious practices."

81.     WorldCom's admission that its huge $3.8 billion expense concealment falsification began in the 1stQ 01, *i.e.*, right when the huge WorldCom bond offering was being put together, is of enormous significance. The Registration Statement by which the bonds were sold not only contained WorldCom's false 99 and 00 annual financial statements, certified by Arthur Andersen, but also contained WorldCom's 1stQ 01 results which showed operating profits of $1.4 billion, EPS of $.25 and cash flow from operations of $1.6 billion. *Thus, WorldCom has admitted that these financial results were materially false.*

82.     In 7/02, information surfaced indicating that WorldCom's 99 and 00 financial results had been falsified as well by the use of drawing down upon excess reserves created in connection with earlier acquisitions during 98-99. WorldCom's common stock plunged to pennies a share, and in 7/02, WorldCom went bankrupt. Thus, investors who purchased "investment-grade" rated WorldCom Bonds in 5/00, 12/00 and 5/01 from a company with an apparently huge asset base, strong earning power and billions in positive cash flow have now suffered losses of approximately $13-$14 billion and hold "junk" bonds in a company that never made a true profit, is bankrupt and these bonds are in default. As the graph in Exhibit C shows, the WorldCom bonds collapsed upon the negative company-specific revelations and bankruptcy in 7/02, losing some 90% of their value.

83.     On 7/31/02, WorldCom's former CFO (Scott Sullivan ("Sullivan")) and Controller (Myers) were indicted and arrested for securities fraud in connection with their falsification of WorldCom's financial results. The complaint against Sullivan and Myers states in part:

> [T]he chart set forth below fairly summarizes the quarterly transfers from certain current expense line cost accounts to certain PP&E capital expenditure accounts between April 2001 and April 2002. Figures expressed in the chart are rounded to the nearest million.

- 29 -

WorldCom General Ledger Account Adjustments
(expressed in millions)

| | Income Statements Line Cost Expense Accounts | | | | | | Balance Sheet Asset Accounts | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Inter-state Origin-ating | Special Access Summ-ary | Special Access Local | Total Credits | Other Access-Non Current | Trans-mission Equip-ment | Commu-nications Equip-ment | Furni-ture, Fixtures & Other | Const-ruction in Progress | Total Debits |
| Q1-2001 | $ 671 | $ 100 | | $ 771 | $ 629 | | | | $ 142 | $ 771 |
| Q2-2001 | $ 480 | $ 80 | | $ 560 | | | | | $ 560 | $ 560 |
| Q3-2001 | $ 578 | $ 90 | $ 75 | $ 743 | | $ 343 | $ 400 | | | $ 743 |
| Q4-2001 | $ 539 | $ 317 | $ 85 | $ 941 | | $ 539 | $ 317 | $ 85 | | $ 941 |
| Q1-2002 | $ 575 | $ 153 | $ 80 | $ 818 | | $ 818 | | | | $ 818 |
| GRAND TOTALS | | | | $3,833 | | | | | | $3,833 |

84.    Then, on 9/19/02, it was revealed that WorldCom had misaccounted for an additional $2 billion in earnings, due in part to the Company's improper accounting for its interest in Embratel, which it acquired in 98. This misaccounting added hundreds of millions of dollars to WorldCom's reported earnings.

85.    On 10/14/02, *The Wall Street Journal* reported that:

A closely held company controlled by WorldCom Inc.'s former chief executive, Bernard Ebbers, received $679 million in loans from the Travelers Insurance subsidiary of Citigroup Inc., adding to the potential conflicts of interest faced by Citigroup in its dealings with WorldCom, a lawsuit alleges.

The lawsuit portrays an even deeper financial relationship than previously disclosed between Citigroup and Mr. Ebbers. The former telecom executive also made personal profits from large stock allocations in hot initial public offerings underwritten by Citigroup's Salomon Smith Barney investment-banking unit. And Salomon earned tens of millions of dollars in fees as an underwriter for WorldCom's stock and bond offering.

*    *    *

Citing interviews with an unidentified former senior broker at Salomon, the suit claims that Mr. Grubman and others at Salomon helped Mr. Ebbers obtain $499 million in loans from Travelers in September 1999 for one of his personal holding companies, Joshua Timberlands LLC of Brookhaven, Miss.

- 30 -

\*   \*   \*

Citing public records filed in Mississippi, the complaint also claims that Travelers entered into an additional $180 million loan agreement with Joshua Timberlands in February 2000, bringing the total amount of Ebbers-related loans from Travelers to $679 million.

\*   \*   \*

The complaint suggests – though it doesn't cite definitive evidence – that the loans from Travelers "apparently" were secured not by the real estate that Mr. Ebbers purchased, but by Mr. Ebbers's personal holdings in WorldCom stock. In making that suggestion, attorneys for the New York retirement fund appear to be piecing together details from several different public records on file with state agencies in Mississippi. The complaint states that those records appear to show that Travelers and Mr. Ebbers's holding company began changing the terms of the mortgage loans so that the collateral originally pledged for the loans no longer would be fully pledged. The complaint also cites an August article in the Birmingham News of Alabama, which reported that Mr. Ebbers pledged his WorldCom shares to obtain the loans that Joshua Timberlands used to buy the acreage; the article didn't identify the lender.

86.    On 11/4/02, the bankruptcy examiner's report was released indicating additional problems. As Reuters reported:

An examiner in the WorldCom Inc. bankruptcy case suggested the telephone and data services company took "extraordinary and illegal steps" to manipulate its financial records, and predicted it would have to restate results beyond the $7.68 billion already disclosed.

"A picture is clearly emerging of a company that had a number of troubling and serious issues," Dick Thornburgh, the examiner appointed by the U.S. Trustee, said in a 118-page report filed with the bankruptcy court.

"These issues relate to the culture, internal controls, management, integrity, disclosures and financial statements of the company," he said.

\*   \*   \*

"Our investigation strongly suggests that WorldCom personnel responded to changing business conditions and earnings pressure by taking extraordinary and illegal steps to mask the discrepancy between the financial reality at the company and Wall Street's expectations," Thornburgh said.

The report highlighted the influence former WorldCom Chief Executive Bernard Ebbers had over the company and its board of directors. Ebbers' lawyer has said the investigations will uncover "not a shred of credible evidence that Bernie Ebbers had a thing to do with those (accounting) decisions."

\*   \*   \*

The examiner reviewed more than a million WorldCom documents. Thornburgh said he will continue to probe several areas, including WorldCom's relationship with investment bank Salomon Smith Barney, the accounting for

- 31 -

WorldCom's Latin American investments Embratel and Avantel, and decisions made by the board's audit and compensation committees.

The report indicates that the flow of bad news from the company hasn't stopped. This could foreshadow additional lawsuits brought against the company and make it difficult for it to emerge from Chapter 11 bankruptcy protection, bankruptcy experts said.

*   *   *

Thornburgh offered damning observations about a company where the CEO "exercised substantial influence over the board's decision-making process and actions" and where "critical questioning was discouraged."

The board's compensation and stock option committee "seems to largely abdicate its responsibilities to Mr. Ebbers. It approved compensation packages that appear overly generous and disproportionate."

From Jan. 1, 1999 to Dec. 31, 2001, Ebbers received more than $77 million in cash and benefits, while shareholders lost in excess of $140 billion in value, the report noted.

The report also raised questions about the "unusually close and potentially problematic" relationship between WorldCom and its investment banker Salomon Smith Barney, and Jack Grubman, an influential telecommunications analyst at that firm.

87.     On 11/5/02, the SEC filed an amended complaint against WorldCom in the federal district court in New York with WorldCom's consent, adding claims that WorldCom violated the antifraud provision of the 1933 Act. The amended complaint broadened the Commission's charges to allege that WorldCom misled investors from at least as early as 99 through the 1stQ 02, and further states that the Company has acknowledged that during that period, as a result of undisclosed and improper accounting, WorldCom materially overstated the income it reported on its financial statements by approximately $9 billion. On 11/26/02, the SEC announced that a judgment of permanent injunction was entered in its pending civil enforcement action against WorldCom:

The judgment, signed by U.S. District Judge Jed S. Rakoff of the Southern District of New York: (1) imposes the full injunctive relief sought by the Commission, (2) orders an extensive review of the company's corporate governance systems, policies, plans, and practices, (3) orders an extensive review of the company's internal accounting control structure and policies, (4) orders that WorldCom provide reasonable training and education to certain officers and employees to minimize the possibility of future violations of the federal securities laws, and (5) provides that civil money penalties, if any, will be decided by the Court at a later date.

- 32 -

88.     In late 3/03, news reports indicated that the size of the accounting misstatements was even higher than previous reports, approximately $11 billion.

89.     WorldCom's huge financial reverses traumatized the markets.  In short order, WorldCom stock collapsed, falling to as low as $.05 per share.  The impact on the purchasers of WorldCom Bonds was equally catastrophic.  As the truth about WorldCom, its operations and its finances reached the market during early 02, the price of the WorldCom Bonds collapsed.  *Investors, like plaintiff, who purchased WorldCom Bonds in the 5/01 offering have lost $9 billion in less than one year – a stunning decline for investment-grade rated bonds, normally the safest investment choice for investors.  Investors in WorldCom's 8/98, 5/00 and 12/00 bond offerings have also lost billions of dollars.*  The Wall Street Journal referred to the collapse as the "*worst bond deal in history.*"  The SEC said the restatement of earnings for 01 and the 1stQ 02 showed "improprieties of unprecedented magnitude."  Worse yet, WorldCom has now admitted that its financial results for 99-00 were likely falsified as well.

90.     At the time of the Offerings, WorldCom's finances were collapsing.  In fact, the Company was losing money, not achieving profits.  Its assets and net worth were overstated by billions of dollars.  And its liquidity was impaired.  WorldCom had borrowed about all it could in the commercial paper market and its banks were reluctant to lend it money – pushing it instead to do the Offerings to raise billions of dollars of long-term debt from public investors.  The fact that the WorldCom 5/01 offering was necessary to prevent a financial collapse of WorldCom is confirmed by the recent admission of John Sidgmore, the successor to Ebbers, at WorldCom's 02 Annual Meeting of Shareholders on 6/13/02.  There he said that WorldCom had $8 billion dollars of short-term debt in early 01 prior to the bond offering, but "*if we had commercial paper six months ago, we would be flat-out out of business and Scott [Sullivan, WorldCom's CFO] and his team negotiated all those away.... [F]rankly Scott has done a fantastic job of shoring up our balance sheet and that is the only reason this company has a chance when a lot of the other ones are going under.*"

91.     On 6/28/02, the *Financial Times* reported:

BOND ISSUANCE PRIDE CAME BEFORE A FALL

- 33 -

For an idea of the scale of the demise of WorldCom, look no further than May 2001, when the company raised $11.9bn in the capital markets and gained bragging rights – for the second time – to being the issuer of one of the market's biggest ever transactions.

WorldCom had credit ratings at the time of BBB+ from Standard & Poor's and A3 from Moody's Investors Service.

These levels are in the bottom half of investment grade range of creditworthiness ratings, but are still comfortably within that range.

The fact that WorldCom was so rated by Moody's and S&P was undoubtedly a factor in attracting strong investor interest to its enormous bond issue, which included tranches in euros and sterling as well as a mammoth US dollar issue.

\* \* \*

The scale of WorldCom's slide down the creditworthiness scale has angered some investors.

\* \* \*

[C]riticism has come from Sean Egan, a founder of Egan-Jones Ratings, an independent credit-rating firm ....

\* \* \*

Egan said: "WorldCom should not have been able to raise $11.9bn last year and would not have been [able to raise this money] if its credit rating had been where it should have been."

92.     According to *The Wall Street Journal*:

INSIDE WORLDCOM'S UNEARTHING OF A VAST ACCOUNTING SCANDAL

\* \* \*

Mr. Sullivan never attempted to cover up the aggressive accounting method, the person familiar with the matter says. Details are spelled out clearly enough in internal company documents, this person says, that "other people had to see it unless they were blind."

### WORLDCOM'S FALSE FINANCIAL STATEMENTS
### INCLUDED IN THE OFFERING DOCUMENTS

93.     WorldCom's reported financial statements included in the 8/98, 5/00 and 5/01 Registration Statements and 12/00 Offering Memorandum were falsified in several ways. In fact, financial statement manipulation was a way of life at WorldCom. As Ebbers told an employee, "We won't have to worry about earnings-per-share growth for years, with all our acquisitions," alluding to WorldCom's long-standing practice of manipulating reported results through taking excessive

- 34 -

"one-time" charges in connection with acquisitions and later on reducing or drawing down on these charges to artificially boost subsequently reported operating earnings. These excessive charges began in the mid-1990s and were used to inflate later results. Beginning at least in 99, WorldCom grossly inflated its earnings by transferring billions of dollars of ongoing operating expenses to capital expenditures so that the costs would be considered an asset rather than an expense. WorldCom admitted in 6/02 that its 1stQ 01 results, as well as the rest of 01 and 1stQ 02, were overstated by $3.8 billion and that it would restate those results. It has recently been disclosed that WorldCom's misstatements approximate $11 billion. WorldCom's financial statement manipulations also included improper capitalization of internal development software costs, improper revenue recognition, and the failure to make timely write-offs for impairment of goodwill. On 9/26/02, Myers, the former controller of WorldCom, pleaded guilty to securities fraud charges admitting he was instructed to falsify records in what became the largest corporate accounting scandal in U.S. history. "I was instructed on a quarterly basis by senior management to ensure that entries were made to falsify WorldCom's books to reduce WorldCom's reported actual costs and therefore to increase WorldCom's reported earnings," Myers told Judge Richard Casey.

94.    The 8/98 Prospectus/Registration Statement included WorldCom's 1stQ and 2ndQ 98 results and incorporated WorldCom's 3/31/98 Form 10-Q which contained WorldCom's financial statements for the 1stQ 98, including:

|  | 3/31/98 |
| --- | --- |
| Revenues | $ 2.3 billion |
| Operating Income | $426 million* |
| Net Income (Loss) | ($416 million) |

\* Excluding special charges

95.    The 8/98 Prospectus also stated:

RECENT EVENTS

SECOND QUARTER EARNINGS. On July 23, 1998, WorldCom reported revenues for the three months ended June 30, 1998 of $2.6 billion, a 45 percent increase over revenues of $1.8 billion for the same period in 1997. Net income for the three months ended June 30, 1998 was $227.5 million, a 411 percent increase over net income before extraordinary items of $44.5 million for the same period in 1997.

- 35 -

96.    The 5/00 Registration Statement included WorldCom's 1stQ 00 results and incorporated WorldCom's 3/31/00 Form 10-Q which contained WorldCom's financial statements for the 1stQ 00, including:

|  | 3/31/00 |
|---|---|
| Revenues | $ 9.978 billion |
| Operating Income | $ 2.44 billion |
| Net Income | $ 1.284 billion |
| EPS | $ 0.44 |
| Goodwill & Intangibles | $47.169 billion |
| Ratio of Earnings to Fixed Charges 7.01:1 | |

97.    The 5/01 Registration Statement included the following financial results:

|  | Year Ended 12/31/00 | Quarter Ended 3/31/01 |
|---|---|---|
| Revenues | $39 billion | $ 9.7 billion |
| Operating Income | $ 8.1 billion | $ 1.4 billion |
| Net Income | $ 4 billion | $ 729 million |
| EPS | $1.43 | $0.25 |
| Ratio of earnings to fixed charges | 5.25:1 | n/a |

98.    In fact, WorldCom's reported results for 98, 99, 00 and the 1stQ 01 were overstated due to several improper accounting practices and manipulations. WorldCom later announced an enormous $3.8 billion restatement of its 01 and 1stQ 02 earnings due to improper classification of operating costs as assets. In fact, this manipulation began at least as early as 99. As disclosed in 7/02 congressional testimony, a finance department employee (Troy Normand) told Sullivan in 00 that the accounting entries were wrong. In the 1stQ 00, WorldCom overstated earnings by $33 million due to an improper entry to capitalize operating expenses. The SEC is conducting an extensive investigation into WorldCom's financial statements and reports arising out of its improper accounting practices, such as improper revenue recognition, improper capitalization of software developed for internal use, and excessive charges taken for acquisitions. Had WorldCom properly reported its results in accordance with GAAP, its 00 and 01 results would have looked vastly different, due to an additional $3 billion in expenses in 01, the recognition of $925 million in software development costs as additional *expenses* in 01, at least $5 billion in goodwill write-downs in 1stQ 00, at least $10 billion in goodwill *write-downs in 1stQ 01, the non-recognition of income* from excess merger

- 36 -

charges taken in prior years and the *improper classification of PP&E as goodwill* (understating amortization expense by $695 million per year) and millions and millions of dollars of improper revenue recognition.

    99.    WorldCom's 99-00 financial reports in the 5/00 and 5/01 Registration Statements were supported by the opinion of Andersen, which stated:

> We have audited the accompanying consolidated balance sheets of WorldCom, Inc. (a Georgia corporation) and subsidiaries as of December 31, 1999 and 2000, and the related consolidated statements of operations, shareholders' investment and cash flows for each of the years in the three-year period ended December 31, 2000. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

> We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of WorldCom, Inc. and subsidiaries as of December 31, 1999 and 2000, and the results of their operations and cash flows for each of the years in the three-year period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

Andersen issued a nearly identical letter as to WorldCom's 99 financial statements. The Andersen opinion letters were false because WorldCom's 99 and 00 financial statements did not fairly present WorldCom's financial results in conformity with GAAP

    100.    WorldCom's 98, 99, 00 and 1stQ 01 results were materially false and misleading. WorldCom's financial results for 98, 99, 00 and 1stQ 01 were also not a fair presentation of WorldCom's results, but rather were presented in violation of GAAP, SEC rules and the doctrine of "fair presentation."

    101.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and

inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

## WorldCom's Improper Consolidation of Embratel

102.   WorldCom has admitted to $2 billion in accounting errors related in part to the improper consolidation of entities where it held only a minority interest.

103.   GAAP, as set forth in Accounting Research Bulletin ("ARB") No. 51, states that consolidation is appropriate when an entity has a controlling financial interest which is usually at least 50% of the outstanding voting shares of another company.

104.   WorldCom did not own even 20% of the shares of Embratel but still consolidated the entity in its own financial statements. Embratel then contributed as much as 8% of WorldCom's revenues. On 9/19/02, *The Wall Street Journal* reported that:

> WorldCom Inc. is preparing a further revision of its financial results that could add about $2 billion to the $7 billion in accounting problems it has already disclosed, people close to the situation said.
>
> WorldCom officials are expected to present the company's new findings to the Securities and Exchange Commission tomorrow. The existing restatement from improper accounting was disclosed earlier this summer. While the exact breakdown isn't yet known, some of the revision may partly related to write-downs of assets; an unspecified amount is expected also to stem from improper accounting related to consolidation of foreign subsidiaries.
>
> *   *   *
>
> The expected additional restatements underscore the magnitude of what was already the largest accounting fraud ever and raise questions about whether WorldCom can actually emerge from bankruptcy intact.
>
> *   *   *
>
> The company also will re-evaluate the carrying value of existing property, plants and equipment as to possible impairment of historic values previously reported.
>
> It isn't clear which subsidiaries' results are at issue in the restatement. But one transaction involved WorldCom's decision to incorporate the results of Brazilian telecommunications carrier Embratel Participacoes SA, a Brazilian telecommunications carrier, into its financial results after it bought MCI in 1998. MCI had acquired a 51.8% voting interest in Embratel shortly before the merger and WorldCom continued to consolidate the Embratel results until 2001, when it

restructured its investment, according to an annual report the company filed with the SEC.

At that time, the company said U.S. accounting rules no longer allowed the consolidation of Embratel's results.

**WorldCom's Improper Capitalization of Expenses**

105.    WorldCom has admitted that $7.2 billion in line-cost operating costs that should have been expensed as incurred were in fact capitalized, thereby overstating WorldCom's earnings and its cash flows from operations in at least 99-01.

106.    GAAP as described by FASB Statement of Concepts ("Concepts") No. 5, ¶85, states that expenses are recognized when benefits are used up in delivering services. Assets are recorded only when there is a probable future economic benefit from a cost. Concepts No. 6, ¶25.

107.    WorldCom has now admitted that

it intends to restate its financial statements for 2001 and the first quarter of 2002. As a result of an internal audit of the company's capital expenditure accounting, it was determined that certain transfers from line cost expenses to capital accounts during this period were not made in accordance with generally accepted accounting principles (GAAP). The amount of these transfers was $3.055 billion for 2001 and $797 million for first quarter 2002. Without these transfers, the company's reported EBITDA would be reduced to $6.339 billion for 2001 and $1.368 billion for first quarter 2002, and the company would have reported a net loss for 2001 and for the first quarter of 2002.

108.    It has also been revealed that WorldCom's 99 and 00 results were also impacted by these and other improper accounting entries. As *USA Today* noted on 7/15/02:

Aggressive accounting at WorldCom may have started much earlier than thought, according to just-released company memos – and a growing stream of testimony from WorldCom employees. Rep. Billy Tauzin, R-La., chairman of the House Energy and Commerce Committee, said Sunday that WorldCom documents show that its accounting problems began in 2000 or earlier. They "reveal a strange pattern of people inside the corporation discovering it, trying to do something about it, and ultimately failing until recently," Tauzin said. His committee is investigating WorldCom.

WorldCom, teetering toward Chapter 11, has said fired CFO Scott Sullivan improperly accounted for $3.9 billion in costs in 2001 and the first quarter of 2002. But Tauzin says Troy Normand, who worked in WorldCom's finance department, told Sullivan that some accounting entries in 2000 went beyond aggressive and were wrong. Normand considered resigning, but Sullivan reassured him that everything was okay.

109.    In late 3/03, it was disclosed that WorldCom's misstatements and the amount of its restatement will total $11 billion.

110.   The fact that WorldCom has announced it will restate its financial statements is an admission that the financial statements originally issued were false and that the overstatement of income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by WorldCom was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  WorldCom's restatement was not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements.  Thus the restatement is an admission by WorldCom that its previously issued financial results and its public statements regarding those results were materially false.

**WorldCom's Excessive Acquisition Write-offs**

111.   During the time it was rapidly expanding in 97-00 by making acquisitions, WorldCom consistently recorded excessive "one-time" write-offs and created excessive reserves in connection with acquisitions, creating artificially inflated reserves which it then later used to secretly increase reported operating earnings in later quarters by drawing down on and reducing those reserves or write-offs.  This artifice was deceptive because securities analysts and sophisticated investors expect an acquiring company to establish and record large reserves or write-offs in connection with major acquisitions and treat such items as non-recurring, and therefore they do not have a negative impact on the stock price.  Thus, WorldCom was able to create and record excessive, unduly large write-offs or reserves each time it did an acquisition without any adverse impact on its stock price.  However, WorldCom would then "draw down" on these excessive reserves in later quarters by reducing these excessive reserves to boost reported *operating results*, without disclosing that it was doing this.  This

- 40 -

gave a misleading impression of the strength of WorldCom's operations and its ongoing earnings power by artificially inflating its reported results.

112.    These excess acquisition charges by WorldCom were most often characterized as "in process research and development costs" or other merger-related costs for which write-offs were overstated to create excess reserves which could later be pulled into revenue to inflate operating income.  The write-offs prior to the 8/98 offering included:

| Acquisition | In Process Research & Development | Other Charges |
|---|---|---|
| MFS Comm/UUNet | $2.14 billion | $600 million |
| BRP | | $ 47 million |
| CompuServe | $429 million | |

As *Business Week* noted, "Ebbers took huge write-offs associated with acquisitions, enabling him to pump up future earnings."

113.    WorldCom also inflated its earnings by improperly misclassifying assets in connection with acquisitions.  WorldCom acquired MCI in 9/98 in a transaction accounted for as a purchase.  As is customary in purchase accounting, all MCI assets and liabilities were revalued at the time of the acquisition to their fair market values and then combined with WorldCom's assets and liabilities.  WorldCom *reduced* the book value of MCI's property, plant, and equipment (PP&E) by $3.4 billion to $10.7 billion from the pre-acquisition balance of $14.1 billion.  But then goodwill was commensurately increased by the $3.4 billion reduction in PP&E.  This manipulation inflated WorldCom's earnings during 99-01 *since goodwill is amortized over a 40-year period as opposed to an average of 4.3 years for PP&E.*  Thus, the shorter lived PP&E assets were transmogrified into much longer lived assets, artificially inflating WorldCom's subsequently reported earnings.  *This manipulation increased WorldCom's 99, 00 and 01 annual earnings by $695 million annually by reducing annual amortization/depreciation expense by that amount.*  As MSNBC reported on 7/1/02:

> In its statement to the SEC, WorldCom said its audit committee was reviewing financial records for 1999 through 2001 because questions were raised about significant changes in reserves against potential financial losses.

*       *       *

- 41 -

Companies use reserve accounts to set aside revenue to be used against predictable future costs, such as unpaid bills or pending lawsuits. Companies have much latitude to reduce or increase those reserves, but they are not supposed to do it simply to make revenues look better.

One WorldCom reserve account that appeared to shrink substantially during 1999 and 2000 was the one it used to cover liabilities it would assume from the many companies it was buying up. WorldCom added $2.81 billion to that accounting line from 1998 to 2000, its annual filings with the SEC show.

**WorldCom's Improper Capitalization of
Software Development Costs for Internal Use**

114. WorldCom also improperly capitalized (recorded costs as an asset rather than as an expense) certain internal software development costs which did not qualify for capitalization pursuant to GAAP.

115. GAAP, as set forth in FASB Interpretations No. 6, ¶8, states:

Costs incurred by an enterprise in developing computer software internally for use in its research and development activities are research and development costs and, therefore, shall be charged to expense when incurred. This includes costs incurred during all phases of software development because all of those costs are incurred in a research and development activity.

(Footnote omitted.)

116. Contrary to GAAP and the doctrine of "fair presentation," in 00 WorldCom capitalized $925 million in costs associated with developing internal use software, which amounts were excessive and improper. Had WorldCom properly recorded these costs as expenses, its reported earnings would have been at least 14% lower.

**WorldCom's Improper Revenue Recognition**

117. GAAP, as described by FASB Statement of Concepts No. 5, requires that revenue not be recognized unless and until it has been both earned and is realizable.

118. Prior to the Offerings, WorldCom engaged in practices for which it could not reasonably have expected to realize cash and for which it had not earned the revenue, thus violating both required elements for revenue recognition under GAAP. WorldCom engaged in excessive billing of other telecom companies for services and also in invoicing customers for services the customers had not agreed to purchase, since the contract period had terminated. WorldCom would

- 42 -

recognize revenue from these billing and invoicing improprieties even though it had neither earned the revenue nor was entitled to payment for the billings.

119.   WorldCom also improperly recognized revenue in connection with "take or pay" contracts, whereby customers received a discount from WorldCom when they agreed to use a certain volume of service over a certain time period. However, if the customer used less service, WorldCom imposed a penalty on the customer. Customers were constantly using less than the specified amount, yet WorldCom improperly recognized the penalties as income even though customers were refusing to pay the penalties and WorldCom could not require them to pay. Such revenue recognition was improper because WorldCom had no reasonable expectation that it would be paid for the penalties.

120.   WorldCom also improperly "overbooked" sales and booked revenue it should not have booked because of billing "mistakes." WorldCom classified as ponding payments revenues it had no reason to believe it would collect because the bills had mistakes or customers had dropped the service. As *Bloomberg* reported on 5/29/02:

> After buying control of Embratel [a Brazilian long distance company] in July 1998 ... WorldCom installed a billing system for its 12 million customers separate from that used by local phone service providers.
>
> It was a disaster from the start. Bills arrived irregularly – some people waited five or six months for details on what they owed – or in a format that confused customers accustomed to receiving one monthly phone bill.
>
> "Getting the bills separately is just too complicated." [a major customer] said. "We're not used to that."
>
> By the end of 2000, Embratel had racked up 3 billion reals in accounts receivable, almost double what it was the previous year ....
>
> Total accounts receivable jumped to 1.58 billion reals in 1999 from 1.02 billion reals at the end of 1998. With receivables now at 3.44 billion reals, Embratel has reached an agreement to send its bills to customers with three local operators.

These amounts were not recoverable. WorldCom now will sell Embratel for a 90% discount to what WorldCom paid for it in 98.

121.   WorldCom also improperly recognized revenue through other various improper sales manipulations, including: (a) switching customers' long distance service to WorldCom without approval; (b) misrepresenting rates to customers; (c) recognizing revenue from cancelled accounts; (d) back-dating contracts to recognize revenue at the end of a fiscal quarter; and (e) failing to

- 43 -

properly account for contracts that had been negotiated or discounted. Each of these practices artificially inflated WorldCom's reported revenues, profits and EPS by material amounts as included in the Registration Statements.

**WorldCom's Improper Accounting for Goodwill**

122.    WorldCom's financial statements were also false due to its failure to record impairment in the value of goodwill on its balance sheet. WorldCom has admitted it will have to record charges of $15-$20 billion to write down overvalued goodwill on its balance sheet, and most analysts now believe the actual charge will exceed $45 billion.

123.    GAAP, as set forth in FASB Statement of Standards ("SFAS") No. 121, requires that companies review long-lived assets, including goodwill, to determine if the assets are impaired. SFAS No. 121, ¶¶5-6:

> 5.    The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:
>
> a.    A significant decrease in the market value of an asset.
>
> b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset.
>
> c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator.
>
> d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset.
>
> e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.
>
> 6.    If the examples of events or changes in circumstances set forth in paragraph 5 are present or if other events or changes in circumstances indicate that the carrying amount of an asset that an entity expects to hold and use may not be recoverable, the entity shall estimate the future cash flows expected to result from the use of the asset and its eventual disposition. Future cash flows are the future cash inflows expected to be generated by an asset less the future cash outflows expected to be necessary to obtain those inflows. If the sum of the expected future cash flows (undiscounted and without interest charges) is less than the carrying amount of the asset, the entity shall recognize an impairment loss in accordance with this Statement. Otherwise, an impairment loss shall not be recognized; however, a review of depreciation policies may be appropriate.

(Footnote omitted.)

- 44 -

was revealed that the SEC was investigating WorldCom's accounting practices. Then, in 4/02,

WorldCom slashed its 02 revenues and earnings forecasts even further and analysts indicated that WorldCom's asset write-downs due to the impaired value of its prior acquisitions would now exceed $45 billion. In short order, WorldCom's credit rating was downgraded by the rating agencies to "junk" status and the WorldCom Board was forced to oust Ebbers in an effort to save the Company's credibility – allowing him to leave with a $408 million loan from WorldCom *and* a deal to be paid $1.5 million a year for as long as he lives.

128.    On 6/25/02, WorldCom admitted it engaged in one of the largest financial frauds in history – overstating $3.8 billion in earnings in 01 and the 1stQ 02 by improperly capitalizing normal operating expenses. Instead of a profit for 01, WorldCom suffered a loss. Later WorldCom admitted the improprieties were not only occurring in 01 and 02, but also in 00 and before. Both Congress and the SEC are investigating WorldCom's financial disclosures made during 00. Meanwhile, bonds sold to investors as "investment grade" in 5/01 were "junk" 12 months later and are now trading for $0.15-$0.20 on the dollar.

129.    During 96-99, WorldCom made several large acquisitions, resulting in billions of dollars of goodwill going on to its balance sheet as an asset. In 96, WorldCom acquired MFS Communications in a $14 billion deal that provided WorldCom with its Internet data business. WorldCom also acquired long-distance company MCI for $40 billion, and other companies (Brooks Fiber, CompuServe) for billions more. However, by 5/00, WorldCom's telecom business assets – acquired by WorldCom in 96-00 – were actually worth billions of dollars less than what was being reported by WorldCom on its balance sheet. As a result, at the time of the 5/00 offering and the 5/01 offering, the true value of WorldCom's assets was billions of dollars less than reported by WorldCom in its financial reports – assets WorldCom admitted it would write down by at least $20 billion in less than a year. Even assuming WorldCom had recognized *only 25%* of those goodwill write-downs in 3/01 and *only 50%* of those goodwill write-downs in 5/01, the impact on WorldCom's financial statements would have been of enormous significance, as the graphs below show:

- 46 -







130.    WorldCom did not write down the value of its assets (goodwill) associated with its acquisitions prior to the 5/00 and 5/01 offerings because had it done so these write-downs would have placed WorldCom in violation of, or on the verge of being in violation of, its loan net worth covenants in its $12 billion commercial paper back-up credit facilities.    A write-down of WorldCom's overvalued assets prior to 5/00 and 5/01 would have also vastly reduced WorldCom's shareholder equity and placed it in violation of other debt covenants.    These would have been material adverse facts that would have had to have been disclosed in connection with the 5/01 offering and would likely have resulted in WorldCom's credit rating being downgraded below "investment grade" and would have made the 5/01 offering impossible.

131.    WorldCom's overstated revenues and earnings also materially misstated its financial position in the Registration Statements. WorldCom's reported ratio of earnings to fixed charges was a crucial figure for investors in WorldCom Bonds to evaluate the safety of the investment. This ratio indicates the Company's ability to meet its interest payments from ongoing earnings and together with a corporation's assets and shareholder equity is perhaps the most important financial information in a debt sale. A higher ratio indicates an increased ability to make interest payments, and hence a higher margin of safety for investors. WorldCom reported a ratio of earnings to fixed

- 48 -

charges of 7.01 to 1 for 3/31/00 in the 5/00 Registration Statement and 5.25 to 1 for 00 in the 5/01 Registration Statement, consistent with WorldCom's investment-grade credit rating. In fact, these ratios were highly inflated and misleading as to the true nature of the risk involved in purchasing WorldCom Bonds. Absent the accounting manipulations described herein, these ratios of earnings to fixed charges would have been much lower, and would have exposed the true high risk involved in purchasing these bonds. *Had WorldCom properly expensed the $925 million in software development costs for internal use it incurred during 00, as required by GAAP or the doctrine of "fair presentation," rather than capitalizing it as an asset, and had WorldCom recorded just $5 billion of the $20 billion (25% of the amount required) impairment in goodwill which it should have recorded during 00, WorldCom's ratio of earnings to fixed charges in the Registration Statements would have been only 1.67 to 1 for 00 – a reduction of 68%. This does not even include WorldCom's other accounting falsifications, including recording excessive merger charges, misclassifying assets, improper capitalization of normal operating expenses, and improper revenue recognition. Had WorldCom recorded $10 billion of goodwill impairment in 00 (50% of the required amount) WorldCom would have had no earnings for 00!* Note the following:

WorldCom
Ratio of earnings to fixed charges
(In Millions)

|  | 2000 | |
|---|---|---|
|  | As reported | With Required Acctg Adjustments |
| Pre-tax earnings | $7,568 | $1,643 |
| Fixed charges, net of capitalized interest | $1,120 | $1,120 |
| Earnings | $8,688 | $2,763 |
|  |  |  |
| **Fixed Charges** |  |  |
| Interest Cost | $1,480 | $1,480 |
| Amortization of Financing Costs | $26 | $26 |
| Interest Factor on Rent Expense | $149 | $149 |
| Fixed Charges | $1,655 | $1,655 |
|  |  |  |
| Ratio of Earnings to Fixed Charges | 5.25 | 1.67 |

132.   Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)   The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)   The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

- 50 -

(g)      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

### OTHER FALSE STATEMENTS IN REGISTRATION STATEMENTS

133.    The Registration Statements/Prospectuses for the Offerings included or incorporated by reference additional false and misleading narrative statements.

**The 8/98 Offering**

134.    The narrative statements incorporated in the 8/98 Registration Statement concerning WorldCom's business and recent results were also false and misleading. The 2ndQ 98 results were overstated in terms of revenue, net income and EPS as well as WorldCom's assets, for the reasons stated herein regarding WorldCom's falsification of its financial statements. Thus, claims that the 2ndQ 98 operating income improvement was due to "cost savings" was false as the 2ndQ 98 results were the effects of financial manipulation, not the actual performance or strength of WorldCom's business.

**The 5/00 Offering**

135.    In addition, the statements in the 5/00 Registration Statement that made it appear that the acquisition of Sprint would likely be successful were false.

136.    In fact, the Sprint merger faced significant regulatory hurdles and its consummation was highly suspect. WorldCom's stock had appreciated significantly on the news and would decline if the merger was blocked. The decline in WorldCom's stock price would make (and did make) the Company's debt securities less attractive.

137.    The 5/00 Registration Statement also omitted the $679 million Ebbers' holding company (Joshua Timberlands) had borrowed from Travelers Insurance (a subsidiary of CitiGroup) which was secured by his WorldCom stock.

- 51 -

**The 5/01 Offering**

138.    The narrative statements in the 5/01 Registration Statement concerning WorldCom's business and recent results were also false and misleading. The 1stQ 01 results were overstated in terms of revenue, net income and EPS as well as WorldCom's assets, for all of the reasons stated herein regarding WorldCom's falsification of its financial statements. Thus, claims that the 1stQ 01 results were *"an excellent start"* or that WorldCom was *"on track"* to deliver *"strong growth and solid performance throughout the year"* were false as the 1stQ 01 results were the effects of financial manipulation, not the actual performance or strength of WorldCom's business. The statements regarding the progress made regarding the MCI group were also false as that part of WorldCom's business was performing horribly, and contained billions and billions of dollars of overstated assets which, if properly valued or written off, would have shown in fact that the MCI part of WorldCom's business was suffering huge losses.

139.    In addition, the statement in the 5/01 Registration Statement that WorldCom was *"positioned to use"* its *"global assets and ... customer base"* to lead a new generation of fast growing e-commerce and data-driven segments in the communications industries was false. In fact, WorldCom's business was imploding at the time of the 5/01 Registration Statement and the only way this could be concealed was to falsify WorldCom's financial statements and make these types of false statements about WorldCom's business. Also, the statement that the *"breadth and scale"* of WorldCom's services differentiated WorldCom from its competitors was also false as nothing that WorldCom was offering to the marketplace was unique. All of its products and services were nothing more than commodity-type services, the profitability of which was being increasingly destroyed by intensive, if not uncontrolled, price competition. As a result, claims in statements that WorldCom was *"well positioned to capitalize on growth opportunities" were also false as in fact WorldCom's business had no growth opportunities left.* WorldCom was competing now in a shrinking universe of business, declining revenues, and shrinking profit margins which would, in short order, bring the business to the brink of bankruptcy.

140.    The statement in the 5/01 Registration Statement that WorldCom believed *"our sales and marketing capabilities are one of our strongest competitive advantages"* was also false.

- 52 -

WorldCom's sales and marketing capabilities were the result of dishonest practices in violation of both federal and state laws.  Despite repeated warnings from regulators and, indeed, enforcement actions, WorldCom was consistently engaging in disreputable, if not unlawful, practices to obtain and retain customer accounts, thus artificially boosting its customer accounts, revenues and reported income.

141.  CitiGroup's loans to Ebbers' entity, Joshua Timberlands, had increased to $679 million.  Despite the fact that CitiGroup was the lead underwriter of this offering, this fact was not disclosed.

142.  The statement in the 5/01 Registration Statement that WorldCom had taken a $685 million charge in the 3rdQ 00 for specific accounts "that were no longer deemed collectible due to bankruptcies, litigation and settlements of contractual disputes *that occurred in the third quarter of 2000*" was false.  Hundreds of millions of dollars of these charges were due to the correction of a myriad of unsavory and improper practices that WorldCom's MCI unit had utilized to artificially inflate its revenues and earnings for *several years* (95-00) and which MCI and WorldCom had concealed, falsifying its 98 and 99 annual results and 00 quarterly financial results.  These ploys – mainly used to avoid recognizing uncollectible accounts receivable generated by phony revenue transactions – included: (i) turning long overdue customer accounts receivable into "new" promissory notes and treating them as current; (ii) "place holder credits" by which overdue accounts receivable were credited even though no payment had been received; (iii) phony factoring of receivables to make them appear to have been paid or guaranteed by a factor when in fact MCI secretly guaranteed the factor against loss; and (iv) not recording in a timely manner hundreds of millions of dollars of over-charges on or refunds due to customers.

143.  Had WorldCom's 5/01 Registration Statement revealed these true facts, it would have been apparent to investors that WorldCom had been falsifying its financial statements *for years* rather than suffering write-downs due to very recent events, all of which had just occurred in one quarter, *i.e.*, the 3rdQ 00.  In addition, the statement regarding the $685 million charge was false in making it appear that WorldCom had "cleaned up" its accounts receivable and that it no longer had any material amount of uncollectible accounts receivable.  In fact, WorldCom still had hundreds of

millions of dollars of uncollectible accounts receivable, especially in its wireless resale business, a line of business which was losing huge amounts, in large part because it was selling to uncreditworthy and unsuccessful wireless communications entities which were unable to pay WorldCom – a situation so serious that WorldCom could not even sell this business off but would have to simply abandon it, something Ebbers' successor just recently announced WorldCom would do.

144.   *The Wall Street Journal* noted on 5/1/02:

**WorldCom's Bonds: Worst Ever?** – Investors Unload in Response to CEO Ebbers's Departure; Corporate Debt Prices Suffer

*       *       *

In May 2001, when WorldCom sold a record $11.8 billion of bonds, investors clamored to get their hands on them.

Now, they're scrambling to get out.

*In what will likely go down as the worst bond deal in history, WorldCom's bonds are now trading at about half their original value, meaning investors have lost almost $6 billion in just under a year – a stunning decline for investment-grade-rated bonds, normally among the safest bets investors can make.*

Another article in *The Wall Street Journal* on 5/1/02 stated:

The SEC investigation poses another wild card in WorldCom's restructuring prospects. In addition to Mr. Ebbers's loan, the SEC is looking into how WorldCom booked sales, classified the assets of companies it acquired, and accounted for debts it couldn't collect. The SEC has declined to comment about its investigation, but the seven-page list of documents and information it has requested from WorldCom show the agency is questioning whether some of the company's once-stellar growth was partly an illusion created by aggressive accounting.

The SEC is also closely examining the way the company accounted for goodwill, or intangible assets such as an acquired company's reputation, brand name and earnings potential. And it is probing whether WorldCom booked revenue it shouldn't have or classified as pending payments it had reason to believe it wouldn't collect because the bills were mistaken or customers had dropped the service, according to the agency's letter to the company. Among the SEC's requests: any documents since 1999 relating to disputed customer billings, canceled accounts, and complaints about excessive bills.

The agency also wants information from the past two years relating to "disputed sales commissions," "inflated sales commissions," and "over-booking of sales," the letter says.

Another article in *The Wall Street Journal* on 5/16/02 stated:

- 54 -

On Feb. 4, WorldCom Inc. senior vice president Deborah Surrette sent an e-mail telling the company's employees that some of the colleagues had been scamming the company by double-booking accounts. "My staff has discovered several situations where new accounts have been created in different or same billing platforms for existing customers," her e-mail said. "Commissions," she added would "not be paid on the movement of existing services ... or creation of new accounts with no added net revenue."

&ast; &ast; &ast;

The double-booked sales are just one part of the SEC investigation, and the money involved is small change for WorldCom, which had revenue of $35.18 billion in 2001. Still, the sales abuses illustrate how the company's struggles to meet Wall Street's optimistic expectations while integrating its $37 billion purchase of the former MCI Communications Corp. led to an aggressive corporate culture typified by salespeople eager to make their numbers by any means necessary. "It was really a numbers game with WorldCom," says former employee Hank Larkins, who ran the company's human-resources operations in Ohio. "And people would do anything they could to make those numbers."

Current and former WorldCom employees say the problems began with WorldCom's 1998 acquisition of MCI. Following that deal, Mr. Ebbers and other WorldCom executives surprised many employees by maintaining both companies' ordering and billing systems: the IXPlus system that had been used by WorldCom and the F&E system that had been used by MCI. That opened the door to what current and former employees describe as a widespread pattern of sales abuses. "It was the Wild, Wild West, with no sheriff and no rules," says a veteran sales representative in the Pentagon City office.

&ast; &ast; &ast;

Several employees say they tried to alert upper management to the sales abuses. In February 2000, Mr. Larkins sent a memo detailing the problem to his supervisor in Chicago. She forwarded the e-mail to other executives, but higher-ups told her to drop the matter because it wasn't a human-resources issue, Mr. Larkins recalls. "Nobody wanted to hear about it," he says.

145.   Later, on 9/26/02, WorldCom's former controller pled guilty to securities violations, indicating he had been instructed on a quarterly basis by senior management to falsify WorldCom's financial statements.   In 3/03, news reports indicated that the amount of the accounting misstatements from 99-02 will total $11 billion.

**The Underwriters' "Spinning Activities"**

146.   The 8/98, 5/00 and 5/01 Prospectuses/Registration Statements were also misleading in that each failed to disclose the "spinning" practices certain of the underwriters had engaged in to win the right to underwrite the Offerings and receive the enormous underwriting fees alleged herein.

147.   "Spinning" refers to a practice by a Wall Street firm of doling out IPO shares in new companies to corporate executives of existing corporations in exchange for lucrative investment banking business from the executives' corporations.  As *Washington Post* staff writer Ben White wrote on 9/26/02:

> In remarks at a conference of pension-fund managers on Tuesday, Spitzer said IPO spinning amounted to "commercial bribery."  He said fund managers should pressure the companies they hold in their portfolios to force executives to give back profits they made selling IPO shares.
>
> Spinning also emerged as an issue in Congress last month when documents released by the House Financial Services Committee showed that the former chief executive of WorldCom Inc., Bernard J. Ebbers, made nearly $11 million from initial public offerings by selling shares, mainly in hot technology stocks, awarded to him by Salomon Brothers and its successor firm, Salomon Smith Barney.  During the same period Ebbers received the shares, WorldCom was paying Salomon hundreds of millions of dollars in investment-banking fees.
>
> The documents also showed that Salomon brokers sought to award tens of thousands of IPO shares to other favored telecommunications executives.  It is not clear whether many of these executives actually received the shares.  Salomon was the leading banker for telecom firms in the late 1990s.

148.   In the summer of 02, Congressional investigators learned that CitiGroup had given Ebbers "hot" IPO shares, allowing him to pocket $11 million in risk-free profits. CitiGroup received lead roles in WorldCom's note offerings in exchange for this bribe to Ebbers.

149.   Nevertheless, the Company did not describe this *quid pro quo* in the Registration Statements when discussing its underwriting agreements. The various Registration Statements stated only that:

- 8/98:

> The Underwriters and certain of their affiliates and associates may be customers of, have lending relationships with, engage in transactions with, and/or perform services, including investment banking and commercial banking services, for, the Company and its affiliates in the ordinary course of business.  Salomon Brothers Inc has acted as financial advisor to Worldcom in connection with the MCI/WorldCom Merger, for which it has received certain fees and for which it expects to receive additional fees upon the closing of the MCI/Worldcom Merger. Additionally, Salomon Brothers Holding Company Inc, Credit Suisse First Boston, Lehman Commercial Paper Inc., The Chase Manhattan Bank, Morgan Guaranty Trust Company of New York, and NationsBank of Texas, N.A., affiliates of Salomon Brothers Inc., Credit Suisse First Boston Corporation, Lehman Brothers, Inc., Chase Securities Inc., J.P. Morgan Securities Inc., and NationsBanc Montgomery Securities LLC, respectively, are lenders under the New Credit Facilities. In addition, Salomon Brothers Inc will receive a financial advisory fee.

- 5/00:

The underwriters and their affiliates have performed certain investment banking and advisory and general financing and banking services for us from time to time for which they have received customary fees and expenses. The underwriters and their affiliates may, from time to time, be customers of, engage in transactions with and perform services for us in the ordinary course of their business. Salomon Smith Barney Inc. has acted as financial advisor to WorldCom in connection with the Sprint merger, for which it has received certain fees and for which it expects to receive additional fees upon the closing of the Sprint merger. In addition, Salomon Smith Barney Inc. will receive a financial advisory fee in connection with this offering.

- 5/01:

The underwriters and their affiliates have performed certain investment banking, advisory and general financing and banking services for us from time to time for which they have received customary fees and expenses. The underwriters and their affiliates may, from time to time, be customers of, engage in transactions with and perform services for us in the ordinary course of their business. Certain of the underwriters and their affiliates have in the past and may in the future act as lenders in connection with our credit facilities.

150. The omission of the millions of dollars Ebbers and other WorldCom executives received from the banks, including CitiGroup, through hot IPO allocations in exchange for investment banking business made the Registration Statements false and misleading.

### FIRST CAUSE OF ACTION

#### For Violation of §11 of the 1933 Act
#### Against All Defendants

151. Plaintiff incorporates and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152. Plaintiff asserts only strict liability and negligence claims. Plaintiff does *not* assert claims of fraud or intentional misconduct.

153. Andersen consented to the inclusion of its opinion on WorldCom's 98, 99 and 00 financial statements in the Registration Statements and Prospectuses and reviewed and approved the 3/31/00 and 3/31/01 financial results in the Registration Statements.

154. The Underwriter Defendants sold the WorldCom Bonds in the Offerings as defined in §11(a)(5) of the 1933 Act. The Underwriter Defendants were, therefore, responsible for the contents of the Registration Statements.

155. The following Underwriter Defendants underwrote the Offerings as indicated below:

- 57 -

| Offering | Underwriters |
|----------|--------------|
| 8/98 | CitiGroup, Credit Suisse, J.P. Morgan, Lehman Brothers, NationsBanc |
| 5/00 | Bank America, CitiGroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Lehman Brothers, J.P. Morgan, UBS Warburg |
| 5/01 | ABN AMRO, Bank America, CitiGroup, Deutsche Bank, J.P. Morgan |

156.　·Each of the defendants owed to the purchasers of the WorldCom Bonds, including plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective, to ensure that they were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, defendants knew or should have known of the material misstatements and omissions contained in the Registration Statements.

157.　To protect their own financial position and avoid having WorldCom draw down on its $12 billion commercial paper back-up facility with them, and to get their share of $115 million in underwriting fees, the banks were willing to merchandise the WorldCom Bonds in the Offerings. The Underwriter Defendants arranged a multi-city Roadshow prior to the Offerings during which they, and certain of the WorldCom management, including Ebbers, met with potential investors and money managers and presented highly favorable information about the Company, including forecasts of strong revenue and profit growth for WorldCom. To further insulate themselves from financial exposure for helping to sell the WorldCom Bonds, the Underwriter Defendants also demanded and obtained an agreement from WorldCom that it would indemnify and hold the Underwriter Defendants harmless from any liability for violations of the 1933 Act, which agreement was in violation of law and public policy. The banks also made sure that WorldCom had purchased millions of dollars in directors' and officers' liability insurance to protect the banks from liability in connection with the Offerings.

- 58 -

158. None of the defendants named in this Cause of Action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and did not omit any material facts and were not misleading.

159. The defendants caused to be issued and participated in the issuance of materially false and misleading statements in the Registration Statements and Prospectuses, which misrepresented or failed to disclose, *inter alia*, the adverse facts set forth above. Thus, defendants violated §11 of the 1933 Act.

160. Plaintiff purchased WorldCom Bonds traceable to the false and misleading Registration Statements without knowledge of the untruths or omissions alleged herein. Plaintiff could not have reasonably discovered the nature of these untruths and omissions, and relied either directly or indirectly on the false and misleading Registration Statements in making its purchases of WorldCom Bonds.

161. As a result of its purchases of the WorldCom Bonds, plaintiff has suffered damages.

162. This action was brought within two years after the discovery of the untrue statements and omissions and within five years after the Offerings themselves took place.

### SECOND CAUSE OF ACTION

#### For Violation of §12(a)(2) of the 1933 Act
#### Against J.P. Morgan

163. Plaintiff incorporates and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164. Plaintiff asserts only strict liability and negligence claims. Plaintiff does *not* assert claims of fraud or intentional misconduct.

165. Plaintiff purchased WorldCom debt in the 12/00 offering from J.P. Morgan.

166. By means of the defective Offering Memorandum, J.P. Morgan sold the 7.375% WorldCom bonds which plaintiff purchased.

167. The Offering Memorandum contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. These defendants owed plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Offering

- 59 -

Memorandum to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Memorandum as set forth above.

168.    None of the defendants named in this Cause of Action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Memorandum were true and did not omit any material facts and were not misleading.

169.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Offering Memorandum at the time it acquired the WorldCom debt.

170.    By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff sustained substantial damages in connection with its purchases of WorldCom debt.

171.    This action was brought within two years after the discovery of the untrue statements and omissions and within five years after the offering took place.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A       Awarding plaintiff rescission or damages;

B.      Awarding plaintiff pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

C.      Awarding plaintiff such equitable relief, including preliminary and/or permanent injunctive relief, to freeze or prevent the disposition of the assets of the defendants as necessary to preserve and protect plaintiff's rights to recover; and

D.      Awarding such other legal or equitable relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

DATED: June/8, 2003

KOREIN TILLERY LLC
STEPHEN M. TILLERY

STEPHEN M. TILLERY (#2834995)

701 Market Street, Suite 300
St. Louis, MO 63101
Telephone: 314/241-4844
314/241-3525 (fax)

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
SPENCER A. BURKHOLZ
DAVID C. WALTON
RANDALL J. BARON

WILLIAM S. LERACH

401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
PATRICK J. COUGHLIN
RANDI D. BANDMAN
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

Copyright © 2003 by William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP. William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved — including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Milberg Weiss Bershad Hynes & Lerach LLP is prohibited.

G:\Cases-SD\COMPLNTS\WorldCom_IMRF.cpt